# William B. Smith *v.* The Times Publishing Company, Alexander K. McClure and Frank McLaughlin, Appellants.

*Practice, S. C.—Assignments of error—Charge—Bill of exceptions.*

The filing of the stenographer's notes of the charge, and the printing of the charge in the paper-book will not make it part of the record. In order that assignments to it may be considered, it must affirmatively appear that the filing was the act of the judge himself, or by his express direction, evidenced by his signature either to the charge itself or to the bill of exceptions: Janney v. Howard, 150 Pa. 339, explained and definitively overruled so far as it appears to give countenance to anything beyond a charge properly filed: Pool v. White, 171 Pa. 500; Commonwealth v. Arnold, 161 Pa. 327; Hill v. Egan, 160 Pa. 119; Connell v. O'Neil, 154 Pa. 582, followed.

*Constitutional law—Trial by jury—Act of May 20, 1891.*

The meaning of section 6 of article I. of the constitution of Pennsylvania which provides that "'trial by jury shall be as heretofore, and the right thereof remain inviolate'" is that as to all matters which were the subject of jury trials at the date of the constitution, the right which is to remain inviolate is to a jury "as heretofore" of twelve men who shall render a unanimous verdict.

Trial by jury is by twelve free and lawful men for the purpose of establishing the truth of the matter in issue. Any legislation which merely

| 178 | 481 |
| 180 | 185 |
| 178 | 481 |
| 181 | 400 |
| 178 | 481 |
| 183 | 144 |
| 178 | 481 |
| 186 | 496 |
| 178 | 481 |
| 194 | 186 |
| 178 | 481 |
| e203 | 330 |
| 178 | 481 |
| 207 | ⁴100 |
| 178 | 481 |
| 208 | ⁴438 |
| 209 | 641 |
| 178 | 481 |
| e210 | ⁵166 |
| 27 SC | 418 |
| 178 | 481 |
| 214 | ⁴330 |
| 178 | 481 |
| f 33 SC | ¹314 |
| 178 | 481 |
| f38SC ¹ | 3 |
| 178 | 481 |
| 225 | ⁴468 |

points out the mode of arriving at this object, but does not rob it of any of its essential ingredients cannot be considered an infringement of the right. The constitutional provision as to jury trials does not extend to changes of the preliminaries, or of the minor details, or to subsequent steps between verdict and judgment.

Section 6 of article I. of the constitution of Pennsylvania which provides " that trial by jury shall be as heretofore, and the right thereof remain inviolate," is not infringed by the act of May 20, 1891, P. L. 101, which neither changes nor denies the right of trial by jury, but simply declares that " the Supreme Court shall have power in all cases to affirm, reverse, amend or modify a judgment, order or decree appealed from, and to enter such judgment, order or decree in the case as the Supreme Court may deem proper and just, without returning the record for amendment or modification to the court below, and may order a verdict and judgment set aside, and a new trial had."

In this case the Supreme Court set aside a verdict and judgment for $45,000 in favor of the plaintiff in a libel suit against the publisher of a newspaper, as disproportionate to the offense, but deemed it inexpedient to fix an amount and to give the plaintiff the choice to accept it, or take the chances of a new trial.

DEAN, J., concurred in the decision in this case, but dissented from so much of the opinion of the court as held the act of May 20, 1891, constitutional.

STERRETT, C. J., also filed a concurring opinion.

Argued Jan. 28, 1896. Appeal, No. 212, July T., 1895, by defendant, from judgment of C. P. No. 3, Phila, Co., Sept. T., 1892, No. 549, on verdict for plaintiff. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

STERRETT, C. J., and DEAN, J., concurred in the decision, but the former also favored sustaining the fourth assignment of error, and the latter favored reversing on the fourth assignment of error alone, and dissented from so much of the opinion of the court as held the act of May 20, 1891, constitutional.

Trespass for libel. Before GORDON, J.

The alleged libelous matter was contained in two articles, published in the " Times " on the second and third days of October, 1892, and offered in evidence. The libelous part is sufficiently quoted in the charge of the court.

During the progress of the trial Mr. Shields, counsel for

plaintiff, said: "We challenge the defendants to prove the article and justify it if they will."

Mr. Rothermel: "Fortunately we are in a position in which that is not necessary, as Mr. Smith has proved the truth of it himself while upon the stand."

The Court: "It comes down, then, to the same point, as counsel alleges that the article is true."

Mr. Rothermel: "I will ask for an exception to that remark." Exception granted. [4]

The court charged in part as follows:

The plaintiff, William B. Smith, seeks at your hands damages for a libel alleged to have been published by the defendants, injurious to his character, and hurtful to his reputation as a man, a citizen, and a neighbor. He alleges that this wrong was done him while he was a private citizen, and that it was done maliciously, wickedly, and wrongfully, and with the specific intent to injure and defame him. The defendants are the publishers and the editor of a newspaper published in this city. The publication complained of was made in the defendants' journal on the second and third days of October, 1892. . . .

The publication complained of by this plaintiff related to the acts of a private citizen, and in making them the subject of a printed statement, the defendants in this case had no shield of privilege; and in the first instance, therefore, I charge you that the matter complained of as libelous was not a subject of "privilege." The simple question, or questions, therefore, for you to determine, is whether the publication was true or not, and whether it was injurious to the character of the plaintiff; whether it was defamatory to his reputation. If it was, then it is a libel, and he is entitled to recover a verdict at your hands.

The plaintiff alleges also that this libel was published with express malice, and with the intent to injure him, to work him harm, to make his character a subject of contempt and hatred, and to cause him to be believed to be guilty of a criminal offense. The effect of this allegation of express malice I will elaborate later on—for the present I will merely say that if established it is a matter for which the jury may impose additional damages in computing the injuries sustained. The first thing which you will consider is whether the published matter for which

the plaintiff seeks redress at your hands was true or not. If it was true then there was no libel and there can be no verdict for the plaintiff. If it was untrue, if it was false, then the verdict must be for him.

The nature of the defense in this case, as raised by the defendants' own plea, is such that the question of the truth or falsity of the publication has a peculiar and limited relation to the defense itself; but I say to you generally that for a libel such as that complained of by this plaintiff there can be no defense which will defeat his right to a verdict except proof of the substantial truth of all the substantial matters contained in the publication.

The law bearing upon the question of damages I shall state to you at length in that part of my charge wherein I refer to the facts. For the present, however, I will state these two propositions: That if the matter is found by you to be libelous the plaintiff would be entitled, first, to compensation for the injury which he has suffered; and next, if you should find from the evidence in the case that the libel was published with the express intent to defame and harm him in his character and reputation, or, to use the language of his complaint in this case, if you should find that the publication was made wickedly, maliciously, and wrongfully, intending to injure him then you have a right to award him such additional damages as you may think the circumstances of the case justify by way of example and punishment for such wanton abuse of the liberty of publication.

In a case such as this there may be two defenses, one that the matter published is true, and therefore not libelous. This defense is called justification, and when it is intended to be relied upon by a defendant it must be pleaded specially, so that the plaintiff may know when he comes into court that he must establish the untruth of the charges. Second, another defense which may be set up is a denial of the publication of the alleged libel. This defense involves either that the defendants did not publish the matter complained of, or that the matter complained of was not libelous in that it did not defame the plaintiff in the manner and form alleged. In the present case the defendants have entered a plea of "not guilty," and this plea therefore confines this defense, upon the question of libel or not, to whether the printed matter was defamatory of the character of the plain-

tiff, as alleged by him, and was published by the defendants. In other words, the defendants do not plead, by way of defense, that the libelous matter is true, but that they did not publish the libelous matter. This brings up the question of the tendency and meaning of the publication itself.

The plaintiff, in his statement filed, has not only set out the language of the publication, but has averred also the meaning and effect of the words as published, or, in technical legal language, he has accompanied the words with an innuendo; the innuendoes contain plaintiff's allegation of the effect of the publication whereby it is alleged to be libelous. It is this that the defendants' plea denies, that is, it denies that a libel, as alleged by the plaintiff, was published by them, and does not assert that the words with their innuendoes were true.

Evidence has been introduced by the defendants tending to establish the truth of some of the facts contained in the entire article as published in the paper, but only with the avowed purpose, as stated by counsel, of mitigating the damages which you should give the plaintiff if you should find the article to be libelous. Such evidence could, under the plea, only have been admitted for this purpose, and as I shall explain to you later in my charge, when you come to consider it, you will regard it only to the extent limited by the purpose for which it has been offered.

[Where a defendant, charged with libel, justifies the publication by pleading its truth, such a defense, if not established, may be considered by the jury as a reason for imposing additional damages for the persistence in asserting as true that which is failed to be proved.] [3] . . .

The plaintiff in this case has offered in evidence the newspapers which contain the alleged libel, and he has in his pleading set out the particular parts of the publication which he says are untruthful, injurious, and libelous, and I will read these to you first without the innuendoes, and then with the innuendoes which are contained in his declaration. Let me say that I do not intend to go fully into all the facts in this case. I do not think it is called for. Nevertheless, I wish to leave nothing of substance uncovered by my charge, for I do not wish that any one may be able to complain justly that the court has not treated with judicial fairness and fullness every proper matter in the cause.

The libelous matter alleged in the declaration or statement of the plaintiff is as follows : " The dandy Mayor skips. Col. William B. Smith shakes Philadelphia dust from his feet. A sudden flight to the West. His legacy of bogus checks, protested notes, and bad debts. Escaping prosecution. The gallant colonel is at last overwhelmed by his financial irregularities and dares not wait to meet the issue. Overwhelmed with debt, ex-Mayor William B. Smith suddenly shook the dust of Philadelphia from his feet this week and started West, leaving behind a legacy of bogus checks, protested notes, and broken contracts. This time the gallant colonel left for good. It was on Wednesday that his ill-omened star westward took its way." Those are the libelous words contained in the article first published complained of by this plaintiff. In his declaration he avers that those words conveyed to those who read them, and reasonably might convey, a certain meaning injurious to his character, and he has set out what he says those meanings were in the paper filed by him in the cause. Now let me read you the same words with the allegation of what they mean, and what effect they had upon those who read them : " The dandy Mayor skips." " Thereby," says the plaintiff, " meaning that the said plaintiff was a fugitive from justice, and had left the city of Philadelphia for the purpose of escaping prosecution for crimes and offenses committed by him against the law." " Col. William B. Smith shakes Philadelphia dust from his feet. A sudden flight to the West," " thereby meaning that the said plaintiff had fled from the city of Philadelphia for the purpose of escaping prosecution for crimes and offenses against the law committed by him." " His legacy of bogus checks," " thereby meaning fraudulent and unlawful checks for the payment of money drawn upon banks by the said plaintiff for the purpose of obtaining money by means of false pretenses and with the intent to cheat and defraud." " Protested notes and bad debts. Escaping prosecution," " thereby meaning that the said plaintiff had committed crimes and offenses against the law and by a sudden flight had escaped legal prosecution by arrest and indictment for the same."

And so, gentlemen, as to the other parts which I read to you, there are similar innuendoes alleged ; that is, averments that the words meant that he had been guilty of crimes, that

he had passed fraudulent and unlawful checks for dishonest purposes, and had gone away to escape the criminal consequence of his acts.   On the day following the publication complained of in the manner I have read, there appeared another article, a part of which I will read to you, as contained in the plaintiff's declaration.   I will read it first without the innuendoes alleged by the plaintiff, and then I will state to you the innuendoes. "Billy's last grab.   The dandy Mayor would let nobody escape this time.   Colonel Smith's autograph as a legacy to his fellow citizens.   A trained sharper's great work.   Before he emigrated to the West, the enterprising colonel gathered in all the money that was not chained down, and his friends say that his bad debts will run into many thousands.   The sudden emigration of ex-Mayor William B. Smith has caused more excitement in the way of talk about bogus checks and bad debts than this town has known since the dandy Mayor's great grab-game administration.   There are those who contemplate his latest move without reflecting that they are out of pocket, but they seem to be the ones with whom the enterprising colonel had not succeeded in striking up an acquaintance.   Everybody else is in mourning.   Colonel Smith's list of acquaintances possessing more or less boodle was something that would appall an ordinary sharper, but with a majority of them the irrepressible 'Billy,' as the boys jocularly greet him, seems to have maintained himself upon a negotiable footing to the last.   The story of his sudden departure last Wednesday for the West, as published in the Times yesterday, was the sensation of the day. With the bogus checks, protested notes, broken contracts, and bad debts which he left behind as a legacy to the city that had proudly elevated him to its chief magistracy, hundreds were plastered, yet, as showing the wonderful popularity of the man, there are few who exhibited heated indignation over the matter, and many of the victims expressed the hope that whereever he might go he would continue to do well.   It all seemed like corroboration of Barnum's theory that people like to be humbugged.   Some of the remarks made by the Sunday pedestrians, who always halt at the Times bulletin board, were especially instructive.   Everybody seemed to know Billy Smith, and they invariably expressed the greatest delight over the announcement of his greatest exploit.   One individual rubbed his hands

and gleefully remarked to his companion, ' I've said all along that Smithy would come out ahead.' The house he rented. One man of some anxiety as to the colonel's abrupt departure was conveyancer Daniel H. Buck, from whom he had rented the house he recently occupied, at 1426 Mt. Vernon Street, acting as an agent for Grant Megargee, the owner of the property. Colonel Smith leased the house for one year, and had occupied it only seven months, so that a claim can be made against him for five months' rent. Mr. Buck was on the point of writing to him to call at his office and settle existing accounts when he learned of his flight. To-day he expects to make an inspection of the house in order to see if there is any furniture in it. The neighbors say that Colonel Smith moved a lot of furniture into the house last Spring and they have not seen any of it come out. They think, however, that it has been pretty thoroughly levied upon by various people. One of the neighbors said last night that she saw Colonel Smith and his wife take their departure on Wednesday morning. First, the gallant colonel came to the door and made a reconnoissance, after which he boldly issued upon the steps with a huge valise in his hands. Mrs. Smith followed him, carrying a hand bag. They walked rapidly in the direction of the Broad Street Station. Their daughter had gone on the previous night to Germantown, where she will live with the parents of her husband, who is dead. Their son, a bright young man of twenty, is living down town where he is employed."

You will understand, gentlemen of the jury, that what I have read to you does not contain the entire article as published, but the matter complained of as libelous, some of it being in the headline at the top, some of it being by way of introduction, some of it being by way of subheading, and some of it being in the body of the articles. That which I have read you he avers in his statement to have been intended to convey the idea that this man had committed a crime and was running away to escape the law; that he was running away to escape criminal prosecution; that the words "bogus checks," "sudden flight to the West," "escaping prosecution," "dare not meet the issue," "financial irregularity," and other expressions that I have read, all taken together or singly were intended and did convey the meaning that this man was guilty of criminal dis-

honesty or fraud, and that he had gone from his home, and gone for good, in order that the criminal law might not reach him and punish him for his crimes.

You will have the two papers containing these articles out with you. They have all been read in evidence. It is for you to consider their meaning. You twelve men of average intelligence are asked, from your own reading of these articles, to say what was the reasonable meaning attached to those words. Do they accuse William B. Smith of committing crimes for which he was liable to prosecution, and that he had fled because of those crimes and to escape the legal result? If you find such a meaning, and that is for you, your verdict in this case must be for the plaintiff.

The defendants' plea does not aver that that meaning is true. They say the words hadn't that meaning, and, therefore, I say at the door of this case, before you go a step further, and as decisive of your verdict, you must say what the reasonable construction of those words is—considering the whole article, the appearance of it, the manner in which it is printed—and if you find that the averment of the plaintiff is true, and that those words did convey the meaning that he had committed crime for which he was fleeing from this jurisdiction, your verdict must be for him.

The defense in this case, as I have said, is a denial that that was the meaning of the words. If you find, after reading all these articles, that that was not the meaning, that no part of them meant or could mean that, to those who read the article, of course your verdict should be for the defendant, because if those words did not mean that thing, if those words did not accuse him of crime and thus did not expose him to hatred, ridicule, contempt, and defamation of character, then there is no libel; but if they did make that accusation, then your verdict must be for him.

If you should find those facts in his favor, then you would be brought to consider the question of damages. What are the damages to which, if you find this publication to be a libel he is entitled? He is entitled to compensation. By the word " compensation " is meant in law that which men ordinarily mean by it. Compensation is that which makes one whole, one thing for another, and if you find the publication to be a libel

in the way I have stated, if you find that publication was a libel, then he is entitled to recover, first, compensation for any damages he has suffered in his character, reputation, peace, and happiness by reason of such defamation, and the determination of that question is for you.

The defendants in this case presented evidence up to the time when they left the court room, began the presentation of evidence, first, to show the truth of some of the statements of this alleged libel, and they offered the truth, admitted by them, only in mitigation of damages, because, as I have said, in not having put the truth of the alleged libel in issue by their plea, they can only afterwards set it up to mitigate the damages. When they endeavored, for any purpose, to establish the truth of this publication, it became a matter for your consideration, and you will say whether the facts testified to from the witness stand justify or prove to any extent the truth of the allegation in the libelous matter. If they did, you can consider that, and ought to, in determining the amount of damage, but only to that extent. When for any purpose a defendant in libel endeavors to establish the truth, he must establish the substantial truth, in order to prevent the recovery of a verdict.

The defendants also, up to the time when they left the court room, had introduced some evidence intended to show that this plaintiff was a man of bad character for honesty and integrity. The weight of that testimony is for you. The plaintiff, on the other hand, called a number of witnesses this morning in rebuttal, to show that his character for integrity and honesty was good. The introduction of this testimony on the part of the defendants, as to his honesty, was also only for the purpose of mitigating or reducing the amount of your verdict if you should find the publication libelous, and it can only have that effect; but in order that you should for this reason reduce your finding from what it otherwise would be, you must be satisfied from what they did establish that this man had a general character in the community for honesty and probity which was bad. [If it does not satisfy you of that which they endeavored to establish, to wit, that he had a bad general character for honesty, you may take into consideration, in fixing the amount of damages, the fact that on the trial they endeavored to establish that he had a bad character, and failed, if they did fail, in so establishing it.] [5]

Let me say to you, character in this view of the law is the general estimation of men.  Good character is the one thing which we all strive to build up, and which probably is the dearest possession of humanity.  It is that which sweetens life and makes it happy, and the deprivation of which is probably the severest calamity which could happen to man.  Unlike substantial and material things which we might possess to-day and lose to-morrow, and possess again, character has in it those elements which, when it is destroyed, makes it almost impossible of subsequent rehabilitation.  It is because of the injury to his character that this plaintiff seeks damages at your hands, and if he has been libeled he is entitled to your verdict.  [And if the defendants have sought to prove that his character was bad, and have failed, you may consider the fact that they have persisted in impugning his character, and done so without sufficient evidence, if you should so find.]  [6]

The plaintiff also says that these publications were malicious and intended; that the injury was intended and expressly and deliberately done ; in other words, that there was express malice.  Look at it, read it, consider it in all its details and make-up, and if you should find it libelous, say whether it bears upon its face the evidence of malicious purpose.  By malice is meant ill will, an injurious intent towards a person, a specific desire to injure.  If you find it in the article itself, then that is called intrinsic or inherent evidence.  In addition to that the plaintiff says there is extrinsic evidence of malice outside of the article, and he took the stand and testified to you that some years before these articles were published he had an interview, which he detailed, with the editor of this newspaper, in which a conversation took place respecting committees of councils, and the plaintiff says after he was requested by this editor to retain a certain person as chairman of the railroad committee and declined, he was threatened thereafter with punishment in his political life, and that he would be driven from the city.  You are asked to find from that express and deliberate malice.  The editor of the paper took the witness stand and denied that he used that threat.  He admitted having a conversation with the plaintiff, and that the conversation generally related to the subject of the composition of·committees of council over which Mr. Smith had been elected to preside.  He denied, however,

that he had used any language containing threats. It is for you
to say which of those two persons you will believe. You have
heard them, you saw them upon the stand, you observed their
manner, and their credibility is for you. If you believe the
plaintiff, that such a threat was made, it would be evidence of
express malice from which you might find the continuance of a
desire to do him wrong; but whether you believe him, or
whether you believe the editor who denied making that threat,
is entirely for you. Those two persons on the witness stand
are simply two sworn witnesses, to be judged by the same rules
that every other witness is to be judged by, to be given the
same fair treatment with absolute impartiality, and it is for
you to say which one is to be believed and which to be dis-
believed.

[If you find there was express malice—and I leave that
entirely to you—if you find there was express malice or any
wantonness in this attack which would amount to a reckless
disregard of consequences, you would be entitled to also give
this plaintiff, if you should find the articles libelous, an addi-
tional sum by way of example and punishment for the wrong
which has been done him; to give what is called exemplary
damages, and I want to read to you a very brief definition of
what exemplary damages are, a definition from a text book of
approved authority. " The general rule is, that when the injury
has been inflicted maliciously or wantonly or with circumstances
of contumely or indignity, the jury are not restricted to actual
damages, but may give such damages in addition thereto as the
circumstances of the case seem to warrant, to deter others from
like offenses." Such is what exemplary damages are. In this
case, if you find express malice, you may add such damages to
your verdict in addition to compensation.] [11]

Now, gentlemen of the jury, I don't mean to go over this evi-
dence any further. I leave it, as I leave all the case, to you
for your determination. The law I have explained. Be gov-
erned by that implicitly. As I have said, if I have made a mis-
take in that, I can be corrected. You follow the law as I have
given it to you, and consider the facts being governed by the
law. [If you believe this article was not libelous in that it
did not say the things of the plaintiff which he alleges it did
say, and with the meaning which he alleges, then your verdict

should be for the defendants ; but if you find it did contain
the meaning which he alleges and was injurious to him, find a
verdict for him and fix the damages under the instructions I
have given you—first, for compensation ; next, and only then,
for exemplary damages, if you should find that there was ex-
press malice, wantonness, and an intent to injure him specifi-
cally.] [9] [Let me beg you to consider this case as one of
solemn obligation, and to render such a verdict as will satisfy
the ends of justice. The plaintiff has fixed his damages in his
statement at the sum of $50,000. That is the utmost limit
towards which you may go. But between this amount and the
smallest sum your discretion is absolute.] [10] Consider its
importance, its importance to this man, its importance to these
defendants, and let your verdict be rendered without fear and
without favor. This is a court of justice, and you and I and
those learned gentlemen who represent the parties, are all officers
sworn to perform our duties with integrity, and let us perform
them with integrity, without fear, and without partiality, so
that what we do shall redound to the promotion of justice, to
the promotion of good order, and to social welfare.

Verdict and judgment for plaintiff for $45,000.    Defendants
appealed.

*Errors assigned* were .(1) the verdict was excessive ; (2) the
court below erred in not setting aside the verdict as excessive ;
(3, 5, 6, 9, 10, 11) portions of charge as above, quoting them ;
(4) ruling on remark of counsel as above ; (7, 8) that the charge
was defective as a whole ; (12) that the trial judge erred in
refusing defendants' motion to instruct the official stenographer
to place upon his notes the remarks of counsel ; (13) that the
trial judge erred in not granting the defendants' motion to with-
draw a juror, and continue the case, and in declining to hear, or
permit the filing of reasons for such motion.

The record did not show that the stenographer's notes of the
charge had been filed by the direction of the trial judge.

*P. F. Rothermel, Jr.,* with him *James H. Shakespeare,* for
appellants.—The act of May 20, 1891, is constitutional : Baker
v. Madison, 62 Wis. 137 ; Abbott v. Tolliver, 71 Wis. 64 ;
Waterman v. Railroad, 82 Wis. 613 ; McCarthy v. Niskern, 22

Minn. 90; Woodward v. Glidden, 33 Minn. 108; Gunderson
v. Elevator Co., 47 Minn. 161; Haynes v. Trenton, 108 Mo.
123; Gurley v. R. R., 104 Mo. 211; Furnish v. R. R., 102 Mo.
438; R. R. v. Brown, 26 Kan. 443; R. R. v. Peavey, 29 Kan.
170; Upcher v. Oberlender, 50 Kan. 315; Kelly v. McDonald,
39 Ark. 387; Fordyce v. Jackson, 56 Ark. 594; Fordyce v.
Nix, 58 Ark. 136; R. R. Co. v. Sponier, 85 Ind. 165; Turnpike
Co. v. Andrews, 102 Ind. 138; Howard County v. Legg, 110
Ind. 479; R. R. v. Finlayson, 16 Neb. 578; Orleans v. Perry,
24 Neb. 831; Meharrey v. Halligan, 29 Neb. 565; Collins v.
Council Bluffs, 35 Iowa, 432; Rose v. R. R. 39 Iowa, 246;
Cooper v. Mills County, 69 Iowa, 350.

The filing of a plea of justification and the failure to convince
the jury of the truth thereof is only evidence of malice when it
is maliciously filed, and the question of the bona fides of the
filing thereof is for the jury: Pallet v. Sergent, 36 N. H. 496;
Ward v. Dick, 47 Conn. 300; Parke v. Blackiston, 3 Harr.
373; In New York, by statute; In Massachusetts, by statute;
Rayner v. Kinney, 14 Ohio, 283; Byrket v. Monohon, 7 Black-
ford, 83; Henderson v. Fox, 83 Ga. 233; Thomas v. Dunna-
way, 30 Ill. 373; In Michigan, by statute; In Wisconsin, by
statute; Lowe v. Herald, 6 Utah, 175; Shortel v. Hutchinson,
3 Ore. 337; Gorman v. Sutton, 32 Pa. 247; Updegrove v. Zim-
merman, 13 Pa. 619; Howard v. Thomson, 1 Am. Leading
Cases, 178; Dewit v. Greenfield, 5 Ohio, 225; Rush v. Cave-
naugh, 2 Pa. 190.

It is error for the trial judge to call the attention of the jury
in detail and at length to the evidence on one side of the case
without going equally into the evidence on the other: Peirson
v. Duncan, 162 Pa. 187; Burke v. Maxwell, 81 Pa. 139; Hers-
tine v. R. R. 151 Pa. 244; Schwenk v. Kehler, 122 Pa. 67;
Reber v. Herring, 115 Pa. 599; R. R. Co. v. Enches, 127 Pa.
316; Reichenbach v. Ruddach, 127 Pa. 564.

The charge on the subject of damages was erroneous; Neeb
v. Hope, 111 Pa. 145; 1 Sedgwick on Damages, 546; W. St.
L. & P. R. R. v. Rector, 104 Ill. 296; Snow v. Carpenter, 49
Vt. 426; Kenyon v. Cameron, 20 Atl. Rep. 233; R. R. v. Gas-
tineau, 83 Ky. 119; R. R. v. Burke, 53 Miss. 200; Nicholson
v. Rogers, 31 S. W. 260; Boardman v. Goldsmith, 48 Vt. 403;

R. R. v. Brooks, 83 Ky. 129; Bryant v. Acel, 27 Ga. 37; Willis v. McNeill, 57 Texas 465; Reese v. Hershey, 163 Pa. 253.

The judge erred in not granting the defendants' motion to withdraw a juror and continue the case, and in declining to hear or permit the filing of reasons for such motion: Com. v. Weber, 167 Pa. 153; Holden v. Penna. R. R. 169 Pa. 1.

*A. S. L. Shields*, for appellee.—The appeal should be quashed: Burkholder v. Stahl, 58 Pa. 371; Neiss v. Foster, 64 Pa. 495; Collins v. Leafey, 124 Pa. 203; Pool & Son v. White, 171 Pa. 500.

Juries are the sole judges of the amount of damages where there is no criterion by which they can be determined, and where the charge has correctly stated the law. When, therefore, the trial court sitting in banc has refused to exercise its discretionary power to grant a new trial for alleged excessive damages, appellate courts will decline to interfere: Seeley v. Alden, 61 Pa. 302; Penna. R. R. v. Spicker, 105 Pa. 142; Penna. R. R. v. Allen, 53 Pa. 276; Vallo v. United States Express Co., 29 W. N. C. 423.

There is an unbroken line of English and American cases which establishes the principle that, in cases of this kind, no verdict should be set aside because in the opinion of the court the damages are excessive: Huckle v. Money, 2 Wilson, 205; Beardmore v. Carrington, 2 Wilson, 244; Townsend v. Hughes, 2 Mod. 150; Merest v. Harvey, 5 Taunton, 442; Gilbert v. Buckinshaw, Lofft. 771; Hewlett v. Cruchley, 5 Taunton, 277; Rendell v. Hayward, 5 Bing. N. C. 424; Kelly v. Sherlock, L. R. 1 Q. B. Cases, 686; Forsdike v. Stone, L. R. 3 C. P. Cases, 607; Haywood v. Newton, 2 Str. 940; Archbold's Practice, 1525; Duberley v. Gunning, 4 T. R. 651; Berry v. Vreeland, 1 Zab. (N. J.) 183; Lehigh Valley R. R. v. McKeen, 90 Pa. 127; Orbann v. Phila. Traction Co., 19 Phila. 413; Thurston v. Martin, 5 Mason, 496; Whipple v. Cumberland Mfg. Co. 2 Story, 661; Leith v. Pope, 2 W. Bl. 1327; Waters v. Bristol, 26 Conn. 406; Clark v. Pendleton, 20 Conn. 495; Brown v. Tanner, 1 Car. & P. 651; New Orleans v. McBride, 38 Miss. 32; Chenowith v. Hicks, 5 Ind. 224; Blanchard v. Morris, 15 Ill. 35; Goodall v. Thurman, 1 Head, 209; Danville, &c. v. Stewart, 2 Metcalf, (Ky.)119; Smith v. Woodfine, 1 Com. B.

(U. S.) 659; Birchard v. Booth, 4 Wis. 67; Creed v. Fisher, 26
Eng. Law and Eq. 384; Boyce v. Cal. Sage Co., 25 Cal. 460;
Reuck v. McGregor, 3 Vroom, 70; Aldrich v. Palmer, 24 Cal.
513; Ross v. Innis, 35 Ill. 487; Kennedy v. North, 36 Miss. 351;
McCarty v. Fremont, 23 Cal. 196; Treanor v. Donahoe, 9 Cush.
228; Sexton v. Brock, 15 Ark. 345; Wells v. Sawyer, 21 Miss.
354; Lang v. Hopkins, 10 Geo. 37; Barnette v. Hicks, 6 Tex.
352; Cook v. Garza, 9 Tex. 358; Goetz v. Ambs. 27 Miss. 28;
Sargent v. Deniston, 5 Cow. 106; Payne v. The Pacific, etc.,
1 Cal. 33; George v. Law, 1 Cal. 363; Allen v. Blunt, 2 W. &
M. 121; Aiken v. Bemis, 3 W. & M. 348; Carr v. Gale, 3 W.
& M. 38; Rice v. Sims, 8 Rich. 416; Clapp v. Hudson R. R. R.
Co. 19 Barb. 461; Murrey v. Basnett, 18 Fla. 609; St. Paul v.
Kuby, 8 Minn. 125; Miss. &c., R. R. Co. v. Caruth, 51 Miss.
77; Hinchman v. Whetstone, 23 Ill. 108; Stevenson v. Bel-
knap, 6 Clark (Iowa), 97; Coleman v. Southwick, 9 Johns.
(N. Y.) 45.

If the act of May 20, 1891 is to be interpreted according to
the defendants' contention it is unconstitutional, because it
denies the right to a "trial by jury as heretofore:" Vallo v.
United States Express Co., 147 Pa. 404; R. R. Co. v. Fraloff,
100 U. S. 24; R. R. v. McDaniels, 107 U. S. 454; R. R. v.
Winter, 143 U. S. 60; Morning Journal Association v. Ruther-
ford, 51 Fed. Rep. 513; Gale v. R. R., 53 Howard, 385; Schenck
v. Ringler, 11 N. E. 382; Hovey v. Brown, 59 N. H. 114;
Merrill v. Perkins, 61 N. H. 262; Ry. Co. v. Call, 143 Ill. 179;
R. R. v. Bode, 150 Ill. 396; Hunn v. R. R., 78 Mich. 513;
Nelson v. Ry. Co., 13 Ore. 141; Steele v. R. R., 11 S. C. 589;
Dobson v. Cothran, 34 S. C. 518; Thornton v. Britton, 144 Pa.
126; Kelber v. Plough Co., 146 Pa. 485; Terry v. Wenderoth,
147 Pa. 519; Gates v. Penna. R. R., 154 Pa. 566.

If it were the law that an appellate court might reverse the
judgment below because it believed the verdict to be excessive,
the facts of the present case would not justify this court in so
deciding.

It is a good defense to an action for libel if the defendant
can show that the statements alleged to be libelous are true.
But the plaintiff has the right to be informed by the nature of
the plea what defense will be offered. When the attempt is to
be made to prove that the statements alleged to be libelous are

true, there must be a plea of justification as a warning to the plaintiff that his whole character would be assailed: Johnson v. Phila. etc. R. R., 163 Pa. 127; Smith v. Smith, 39 Pa. 441; Gorman v. Sutton, 32 Pa. 247; Struthers v. Peacock, 11 Phila. 287.

The thirteenth assignment relates to a matter exclusively within the discretion of the learned trial court, and not reviewable here: Thompson v. Stevens, 71 Pa. 161; Evans v. Mengel, 3 Pa. 239.

OPINION BY MR. JUSTICE MITCHELL January 4, 1897:

The charge of the learned trial judge to the jury is not before us, and the assignments of error in regard to it must be dismissed for this reason. The filing of the stenographer's notes of the charge, and printing it in the paper-book will not make it part of the record. It must affirmatively appear that the filing was the act of the judge himself, or by his express direction evidenced by his signature either to the charge itself or to the bill of exceptions. This has been so explicitly and so repeatedly decided within the last few years that it ought not to be necessary to say it again: Pool v. White, 171 Pa. 500; Com. v. Arnold, 161 Pa. 327; Hill v. Egan, 160 Pa. 119; Connell v. O'Neil, 154 Pa. 582. The case of Janney v. Howard, 150 Pa. 339, has been so persistently misapplied that it seems almost hopeless to endeavor to set the profession right in regard to it. What that case decided was that when the charge was properly filed it became by virtue of the act of March 24, 1877, P. L. 38, a part of the record for the purpose of assignment of errors although the exceptions had not been made in the court below, as required by previous practice. The case is authority for this construction of the act of 1877 but decided nothing further. An inadvertent expression in the opinion however that errors may be assigned "to any part of a charge which has been filed *with or without request*" fell in so conveniently with the indolence or carelessness of some practitioners that it has been constantly harped upon since as if it meant that this court would take judicial notice of the charge without inquiring how it came before us, and this idea still persists notwithstanding the explicit and reiterated rulings to the contrary in the cases already referred to. Fries v. Null, 154 Pa. 573, and Grugan v. Phila.,

158 Pa. 337, followed Janney v. Howard as to the assignment of errors to a charge properly filed, but did not go beyond that, and so far as Janney v. Howard appears to give countenance to anything further it is now definitively overruled, and is not to be cited again as authority on that point.

In the case before us owing no doubt to the defendants having left the court room before the charge was delivered the judge was not asked to file it, and although he signed a bill of exceptions to the evidence and his rulings thereon, he did not include the charge. It is therefore no part of the record, and the assignments of error to it must be dismissed.

There remain the exceptions based on the amount of the verdict. This is a matter which has not been within our province to consider, until it was made so by the act of May 20, 1891, P. L. 101. It is a new power, a wide departure from the policy of centuries in regard to appellate courts, and so clearly exceptional in character that no case has been presented until now, in which we have felt called upon to exercise it. But the duty has been put upon us by the law-making authority of the state, and we must perform it in accordance with the spirit of the enactment. The argument against the constitutional validity of the act has had the most deliberate consideration, but we do not think it can prevail.

The provision of the constitution is that " trial by jury shall be as heretofore, and the right thereof remain inviolate." The same or very similar language is contained in the constitution of nearly every state, and the uniform construction by judges and text writers has been that the phrase " shall be as heretofore " refers to the method of trial itself and means that it shall be preserved with its substantial elements, while the second phrase, " the right thereof shall remain inviolate " refers to the right to a jury trial before the *final* decision in all cases where it would have existed at the time of the adoption of the constitution. " The object of the provision " says SHARSWOOD, J., " was to preserve the jury as a tribunal for the decision of all questions of fact: " Wynkoop v. Cooch, 89 Pa. 450. " The general idea intended to be conveyed by the constitutional guarantee of the trial by jury undoubtedly is that all contested issues of fact shall be determined by a jury, and in no other

way. . . . It was not intended to tie up the hands of the legislature so that no regulations of the trial by jury could be made, and it has been held that the provision is not violated so long as the trial by jury is not substantially impaired, although it be made subject to new modes : " Sedgwick on Stat. and Const. Law, 2d ed. 496. " Trial by jury is by twelve free and lawful men who are not of kin to either party, for the purpose of establishing the truth of the matter in issue. . . . Any legislation which merely points out the mode of arriving at this object but does not rob it of any of its essential ingredients, cannot be considered an infringement of the right : " Dowling v. The State, 5 Sm. & M. 685. The definition of a jury adopted by so distinguished a jurist as Mr. Justice MILLER, though more elaborate than this, is not materially different, Miller, Lectures on the Constitution 511, and all the authorities agree that the substantial features, which are to be " as heretofore," are the number twelve, and the unanimity of the verdict. These cannot be altered, and the uniform result of the very numerous cases growing out of legislative attempts to make juries of less number, or to authorize less than the whole to render a verdict, is that as to all matters which were the subject of jury trials at the date of the constitution, the right which is to remain inviolate, is to a jury " as heretofore " of twelve men who shall render a unanimous verdict. Matters not at that time entitled to jury trial, and matters arising under subsequent statutes prescribing a different proceeding, are not included. " The constitutional provisions do not extend the right, they only secure it in cases in which it was a matter of right before. But in doing this they preserve the historical jury of twelve men, with all its incidents : " Cooley, Const. Limitations, 504 (ed. 1890), and see Black on Const. Law, 451 and cases there cited.

The constitutional provision does not however go beyond the essentials of the jury trial as understood at the time. It does not extend to changes of the preliminaries, or of the minor details or to subsequent steps between verdict and judgment. The jury as an institution, has been frequently commented upon by the most learned historians as one of the most remarkable in the history of the world, for the length of time which it has existed and the zealous care with which it has been

cherished by the English speaking race. But while its essential features have been preserved it has undergone great changes in all other respects. Originally the sworn twelve were witnesses as well as jurors, and they were summoned from the vicinage on account of their knowledge of the case or its surroundings. Forsyth, Trial by Jury, ch. 7, sec. 3. The very qualifications which originally put them in the box, would now be generally held to exclude them, and send them, instead, to the witness stand. The jury is above everything a practical part of the administration of justice, and changes of non-essential features, in order to adapt it to the habits and convenience of the people have therefore always been made without hesitation even in this country under the restrictions of the constitutions.

The preliminary pleadings and mode of making up the issue are no part of the jury trial itself. The affidavit of defense law, now of general application in this state to actions ex contractu, originated by agreement among the members of the bar, (see 3 Weekly Notes, 567), but there were two, according to Chief Justice TILGHMAN who thought it an infringement of the right of trial by jury and therefore never gave or took judgment under it. The Supreme Court had no such difficulty: Vanatta v. Anderson, 3 Binn. 417. Constitutional scruples however or the lack of other pegs on which to hang a writ of error, brought the question up again after the adoption of the present constitution, and this Court again found no violation of the right: Lawrence v. Borm, 86 Pa. 225. So the statute for compulsory nonsuits though a change in the jury trial, was held not an infringement of the right: Munn v. Mayor of Pittsburg, 40 Pa. 364; and other changes, such as the qualifications of the jurors themselves, the vicinage from which they shall come, the mode of selecting and summoning them, the regulation of venires, and notably, even the matter of challenges: Warren v. Com., 37 Pa. 45, have been held to be within legislative control. In the case last cited, the whole subject of the constitutional provision, and the changes in jury trial under it, receives a very full and comprehensive discussion from Chief Justice THOMPSON. He quotes Chief Justice TILGHMAN in Biddle v. Com., 13 S. & R. 405, that the act for collection of a license fee by suit before a jus-

tice without a jury was not unconstitutional because it required an affidavit that injustice had been done, before an appeal could be taken to the common pleas, "laws such as these promote justice and leave the existence of trial by jury unimpaired, and that is all that is required by the expression in the constitution that trial by jury shall be as heretofore." Chief Justice Thompson then proceeds: "It is a mistake that is often made, to suppose that every modification of its accompanying powers detracts from the right. This is too narrow and rigid a rule for the practical workings of the constitution and the rights guaranteed by it in the particular in question. There is no violation of the right unless the remedy is denied, or so clogged as not conveniently to be enjoyed. . . . The framers of the constitution . . . undoubtedly knew and intended that legislation must provide the forms under which the right was to be enjoyed, and they meant no more than that it should be enjoyed under regulations which should not take away the right." And in Haines v. Levin, 51 Pa. 412, the same principle is reiterated by Chief Justice Agnew: "The great purpose of the constitution in providing that 'trial by jury shall be as heretofore, and the right thereof remain inviolate' was not to contract the power to furnish modes of civil procedure in courts of justice, but to secure the right of trial by jury in its accustomed form before rights of person or property shall be finally decided," id. p. 414.

The act of 1891 makes no change in the trial itself, nor does it deny the right. All that it does is to provide for another step between the verdict and final judgment, of exactly the same nature and the same effect as the long established power of the lower courts. The authority of the common pleas in the control and revision of excessive verdicts through the means of new trials was firmly settled in England before the foundation of this colony, and has always existed here without challenge under any of our constitutions. It is a power to examine the whole case on the law and the evidence with a view to securing a result not merely legal, but also not manifestly against justice, a power exercised in pursuance of a sound judicial discretion without which the jury system would be a capricious and intolerable tyranny which no people could long endure. This court has had occasion more than once recently to say

that it was a power the courts ought to exercise unflinchingly. It has never been thought to be confined to the judge who heard and saw the witnesses, but belongs to the full court in banc, and was freely exercised by this court when the judges sat separately for jury trials. See for example, Sommer v. Wilt, 4 S. & R. 19. The act of 1891 vests a further power of revision, of the same nature, in this court. It is an authority to review the exercise of the discretion of the court below in this respect, as we do in some others. It is a power of review only, before final judgment, and does not violate the right to a jury trial nor even interfere with it in the particular case more than was or might have been done by the court below. We do not see that it transgresses the constitutional command.

The diligence of counsel for appellants has brought to our attention the decisions upon statutes of substantially the same import in eight of our sister states, and we have examined them enough to be able to say that they uniformly sustain the construction and the validity of the statutes upon the same lines as we have followed in discussing the act of 1891.

The bill of exceptions in the present case brings up the whole evidence, and the study of it compels the conclusion that the amount of the verdict must have been largely influenced by other considerations than calm judgment. The license which the press assumes to itself in the ruthless hunt for sensational news, and in the unsparing invasion of private affairs with which the public has no rightful concern, is the disgrace of modern journalism, and one of the greatest menaces to free institutions. It may well dispose juries in a proper case to give large damages both compensatory and punitive, and with such verdicts the courts will not be readily moved to interfere. In the present case the persistent attacks on the plaintiff long after he had ceased to be an office holder or prominent in public affairs, gave plausibility to the charge that they were further induced by actual malice and the vindictive use of the power of a great newspaper for the gratification of personal objects. These considerations would naturally lead to a large verdict, and all the more so as the defendant's leaving the court room which appears to have been entirely without adequate cause, would be apt to be construed by the jury as an abandonment of

the defense and an admission of the malice charged, or perhaps even as showing a want of confidence in the jury themselves, and therefore an affront. We are unable to resist the conclusion that this very impolitic and unexplained move of the defendants in leaving the court room and instructing their counsel to retire from the trial, was more responsible than all the other circumstances for the amount of the verdict.

Taking all the facts of the case into consideration, and giving great weight as it deserves to the opinion of the learned court below, we are still constrained to believe that the penalty was disproportionate to the offense, and that the interests of public justice and the administration of the law, which always suffer in the reaction from undue severity, require that the verdict should not be allowed to stand. As to the exact form which the order shall take, the court is not entirely agreed. It is customary in setting aside verdicts as excessive, for the common pleas to fix an amount which in their judgment would not be unreasonable, and to give the party the choice to accept it, or take the chances of a new trial. Speaking for myself, I think that course should be pursued here. The plaintiff has won a signal victory, and I do not think he should be deprived of the whole fruits of it except at his own option. I would therefore name a sum which though large and substantial would not have been deemed unreasonable had the jury fixed it, and would give plaintiff the choice to reduce the verdict to that amount or go to another jury. But the majority of my brethren think it inexpedient to enter into the consideration of amounts, and in obedience to their directions the verdict must be set aside generally.

Judgment reversed and venire de novo awarded.

OPINION BY MR. JUSTICE WILLIAMS, January 4, 1897:

I fully concur in the disposition made of this case, and am satisfied that the opinion of the court just filed affords a complete vindication of the judgment. But we have rested our action on the authority conferred by the second section of the act of May 20, 1891. This is the first occasion on which we have availed ourselves of this provision. Its constitutionality has been gravely questioned. The hesitancy of this court about accepting the responsibility which the exercise of the power con-

ferred by this statute necessarily involves, has naturally been regarded as indicating at least a doubt in the minds of the justices about its constitutionality. It seems eminently proper therefore, if not positively desirable, that the constitutional question shall be fully considered and the validity of the statutory provision vindicated, by the aid of any pertinent line of argument that may have presented itself to the mind of any member of the court.

The provision of the constitution thought to be infringed is found in sec. 7, of Art. 1, known as the Declaration of Rights, and is in these words, "Trial by jury shall be as heretofore and the right thereof remain inviolate." The provisions of the second section of the act of 1891 declare that, "The Supreme Court shall have power in all cases to affirm, reverse, amend or modify a judgment, order or decree appealed from, and to enter such judgment order or decree in the case as the Supreme Court may deem proper and just, without returning the record for amendment or modification to the court below, and may order a verdict and judgment set aside, and a new trial had." No part of this section is new except that contained in the last sentence, and it is to that alone we understand the constitutional objection to be raised. It is true that at an early day it seems to have been supposed that the power of this court, in disposing of appeals, to enter such judgment order or decree as to it might seem proper and just, was limited to cases in which the plaintiff in the court below was also the plaintiff in error; while if the defendant in the court below brought up the case and succeeded in convicting the trial court of error he was thought to be entitled to a judgment of unconditional reversal, and to a new venire: Swearingen v. Pendleton, 4 S. &. R. 396. But when the same question came again before this court in Stephens v. Cowan, 6 W. 511, the earlier case was distinctly overruled and the true rule stated to be that the duty of the Supreme Court upon the reversal of a judgment rendered in the court below "given either upon a case stated or a special or a general verdict, is to give such judgment as the court below ought to have given; and this whether the said writ of error was sued out by the plaintiff or the defendant below." This was followed by Mosher v. Small, 5 Pa. 221; Ullery v. Clark, 18 Pa. 148;

Cochran v. Eldridge, 49 Pa. 365, and is no longer open to debate. The legislature entertained the same views about the duty of this court to modify the judgments, orders and decrees of subordinate courts at least as early as 1836, for by an act of that date it authorized and directed the Supreme Court "to examine and correct all, and all manner of, errors of the justices, magistrates and courts of the commonwealth in the process, proceedings, judgments and decrees, as well in criminal as in civil pleas or proceedings, and thereupon to reverse, modify or affirm such judgments and decrees or proceedings as the law doth or shall direct; and generally to minister justice to all persons, in all matters whatsoever as fully and amply as the said court has heretofore had power to do under the constitu tion and laws of the commonwealth."

The power of this court to amend or modify a verdict and judgment in any case that comes before it ought now to be at rest. It has not been questioned since Stephens v. Cowan, supra, in any manner, legislative or judicial, a period of sixty years. The question thought to be an open one grows only out of the last sentence of the second section of the act of 1891. Can the legislature extend the power of review of this court so as to include the review of the refusal to set aside a verdict by the court in which it was rendered? There can be no objection on general principles.

The motion to set aside a verdict may be said to be addressed to the discretionary powers of the trial court. So is the motion to open a judgment to set aside the service of a capias, or a summons, to continue a cause, and the like. But by successive legislative enactments an appeal lies from an order to open a judgment, and from a refusal to open it; from the refusal to enter a judgment for want of a sufficient affidavit of defense; from an order striking off a judgment, and from a refusal to strike off; from the granting of a preliminary injunction, and the refusal to grant it. This legislation as we said in Pennock v. Kennedy, 153 Pa. 579, extends the right of appeal to certain orders which had previously been regarded as within the discretion of the court below. Such extension does not take away the discretionary power of the trial court, but subjects it to review and authorizes the Supreme Court to determine whether

it has been properly exercised in the particular case under review: Kelber v. Plow Company, 146 Pa. 485.   Without special direction by statute, but by virtue of our prerogative as a court of last resort, we have always extended a supervisory control over the exercise of discretionary powers by the subordinate courts whenever an abuse of these powers has been alleged.   It appears to be now urged for the first time, so far as I am aware, that if the discretion of a judge is appealed to by a motion for a new trial, the exercise of his discretion becomes so bound up with the verdict that we cannot determine whether he exercised his discretion properly or not, without interfering with the constitutional right of trial by jury.   We can review and in a proper case reverse his action in opening a judgment, striking it off or setting it aside, but it is contended that his action in regard to granting a new trial, no matter how obvious his mistake may be, is beyond correction by any human tribunal under the provision of the Declaration of Rights already quoted.   This ought not to be the law, and it is perfectly clear that it is not, unless prior to the adoption of the Declaration of Rights it was so held at common law.   The famous provision of the Magna Charta which established trial by jury in England is not decisive of this question.   It simply protected Englishmen from the power of secret, irresponsible tribunals and conceded the jurisdiction of the legally established courts over all causes.   It ran thus " No free man shall be seized, or imprisoned, or dispossessed, or outlawed, or in any way brought to ruin: we will not go against any man or send against any man save by legal judgment of his peers, or by the law of the land."

The trial was to be in accordance with general laws and before the legally constituted courts.   A jury was a constituent part of several of the English courts at this time.   It was not the court in any case, but jurors were summoned by the courts to attend their sessions for the trial of issues of fact.   When duly called and empanelled they sat with and under the legal advice and direction of a law judge who was the responsible head of the court.   " Trial by jury " therefore meant, at the time of Magna Charta, the investigation and decision of an issue of fact between parties litigant by twelve men sitting as jurors under the advice and legal direction of a law judge.

When the verdict is rendered by the jury, it is to the court of which they are a part. It is recorded upon the minutes of the court and becomes a part of the record of the trial, but it does not thereby become a judgment of the court unless the judge is satisfied with it and specially or by general order or rule so directs. He has a responsibility for the result no less than the jury, for it is his duty to see that right and justice are done, so far as this may be practicable in the particular case. If he is not satisfied with the verdict it is his duty to set it aside and grant a new trial before another jury. This was the settled practice in England as early as 1665 : Forsyth on Trial by Jury, 164. Lord Holt states that the practice of granting new trials as a means of correcting the mistakes and relieving against the misconduct of juries was in use much earlier than 1665, but accounts for its exercise not appearing in the books for the reason that prior to that date the action of the courts upon motions was not reported. If we go back still earlier every student of Blackstone will remember that the remedy of a suitor injured by a false verdict was to proceed directly against the members of the jury to attaint them for their false verdict ; but this as a remedy for the party injured was circuitous, inadequate, and practically useless. This was superseded by a more summary proceeding by way of fine and imprisonment which may have been effective as a punishment, but did not relieve the injured suitor. The theory on which this proceeding rested was that the unjust verdict must have been reached by a neglect to follow, or a wilful disregard of, the instructions of the judge, and that such neglect and misconduct was a contempt of court which subjected them to punishment at once.

The next and most important advance made in the practice was to strike at once at the unjust or mistaken verdict by setting it aside and granting a new trial. This afforded the injured suitor relief from the verdict, and afforded him another opportunity to be heard by jurors freshly summoned. This method of dealing with false, corrupt, or mistaken verdicts rapidly took the place of the earlier methods, and had been in common use in England for more than one hundred years when the Declaration of Independence was adopted in 1776. The reasoning by which the new practice was supported was

simple and forcible. As it had been within the undoubted discretion of the judges to fine and imprison jurors for a false verdict, a fortiori it was within their discretionary power to set the false verdict aside and so relieve against the injustice done by it.

In speaking of this change in the practice Forsyth says that "thereby an immense improvement was effected in the jury system inasmuch as the measure (setting aside the false verdict) is remedial, instead of being (like the attaint, and the fine and imprisonment) vindictive." Punishing a jury for misconduct did not undo the wrong done the injured party by their verdict. Among the reasons for the exercise of this power the English courts included excessive damages. It made no difference whether the verdict came up with the roll from nisi prius, or was rendered at bar at Westminster. In either case, if the damages seemed to be excessive, the verdict was set aside and a new trial granted.

The famous case cited by Blackstone as the first reported case in which a verdict was set aside, was one in which the reason for interference was that the damages were excessive: 3 Blk. Com. 387. The action of the court was justified upon the ground that "notorious partiality in the jurors was a principal species of misbehavior" that required the interposition of the judge in the interest of a proper administration of justice and for the protection of suitors. "Next to doing right," says Blackstone in his Commentaries, vol. 3, p. 391, "the great object in the administration of public justice should be to give public satisfaction. If the verdict be liable to many objections and doubts in the opinion of his counsel, or even in the opinion of bystanders, no party would go away satisfied unless he had a prospect of reviewing it;" and he adds, that an injured suitor would come to "abhor a tribunal which he imagined had done him an injury without a possibility of redress." Wood v. Gunston, the first reported case in which a verdict was set aside for excessive damages is in Styles' Reports, 466. It was, like the case now before us, an action for slander. The jury rendered a verdict in favor of the plaintiff for a sum which the court regarded as excessive and the verdict was set aside for that reason. So early therefore as 1665 the courts at Westminster

did precisely what we have done in this case, and for the same reason.

The right of trial by jury was not then supposed to give to a successful party the right to insist on an advantage due to the mistake or the wilful misconduct of the jury no matter how grossly unjust and oppressive the result might be, but the supervisory control of the court in banc, sitting as a court of review, was promptly exercised to relieve against the miscarriage of justice. The exercise of this power was then thought to be in aid of trial by jury. Lord Mansfield in Bright v. Eynon, 1 Burrows, 390, described the effect of thus granting a new trial as " no more than having the cause more deliberately considered by another jury when there is reasonable doubt, or perhaps a certainty that justice has not been done." The function of the jury was well defined by Chief Justice HOLT in Ash v. Ash, nearly one hundred years before the Declaration of Independence : " The jury are to try the cause with the assistance of the Judge." They are not, and have never been, independent of the court of which they are a part, but their verdicts must meet the approval, or at least they must not offend the sense of justice, of the presiding judge who, as the late Justice GRIER of the Supreme Court of the United States was fond of saying, is by virtue of his position " the thirteenth juror." If the damages assessed by the jury are wholly inadequate, the effect is the same as where they are disproportionately large. Stephens in his work on Trials at Nisi Prius states the rule very clearly and in very few words thus : " If a jury give damages to such an amount, either too small or too great as would satisfy any reasonable mind that they must have acted under the influence either of undue motives or some gross error or misconception, this will be ground for a new trial." This was a common law rule in 1790 when our constitution was adopted, and it had been well settled at that time in England for at least one hundred and fifty years : 9 Bacon's Abr. 582 to 629 ; 3 Bouvier's Institutes, par. 3286 ; 7 Am. Com. Law, 132, 133 ; 3 Black.'s Com. ch. 24, pp. 387 to 393 ; Hilliard on New Trials. It is very clear therefore that the act of 1891 does not infringe in any manner upon the right of trial by jury as it stood at common law when our constitution was adopted. The erroneous

verdict was set aside either by the trial judge, or by the courts
at Westminster, whenever it was so excessively large or so
excessively small as to justify the belief that the result was due
to mistake or misconduct on the part of the jury.    This prac-
tice with which the colonies were familiar has continued in the
courts of the states, and of the United States, in some form,
down to the present time; and is as indispensable to the proper
administration of justice now as it was in the days of Lord Mans-
field.    The case of Kuhn v. North, 10 S. & R. 399, was tried at
nisi prius in 1823.    It was an action of trespass quare clausum
fregit for the forcible entry of a dwelling by the sheriff in the
execution of writs of fi. fa. and ca. sa.    The jury rendered
a verdict for the plaintiff giving heavy damages.    This Court
sitting in banc ordered a new trial because of the excessive
character of the verdict.    The opinion of this Court giving the
reasons for setting aside the verdict concludes with these words:
" The court do not say that in every question of this kind they
would measure the damages which a jury might think proper
to give, in a nice balance, but making very liberal allowances
in that respect, they are still bound to see that the damages do
not exceed all moderation; in other words that they are not
intemperate.    Such are the damages given in this case." The
Lehigh Bridge Co. v. Lehigh Coal and Navigation Co., 4 R. 9,
was a proceeding in the court of common pleas of Lehigh
county for the assessment of damages done by the construction
of a bridge across the Lehigh river.    Viewers had been ap-
pointed by and had made report to the common pleas.    Before
the trial it was removed to the circuit court of Lehigh county
in which a verdict was rendered in favor of the plaintiff.    An
appeal was then taken to this Court, and the judgment was
reversed and a new trial ordered.    The opinion was by Chief
Justice GIBSON who placed the reversal on the single ground
that the damages awarded by the jury were excessive.

The tendency in more recent times has been to decline to
enter upon a review of the exercise of the discretionary powers
of the lower courts unless the abuse of that discretion was
alleged by the appellant; but the right upon such an allega-
tion, to review the action of any of the lower courts has been
consistently exercised and so far as we have ever heard without

the slightest question.   We have repeatedly said that upon an allegation of an abuse of discretionary power it was our plain duty to inquire into the facts, and if the complaint was, upon a fair consideration of all the circumstances sustained, to reverse the improper action and correct the wrong done.   The cases on this subject are legion and the doctrine asserted in them is clear and unambiguous.   We have given full effect to the presumption that all things are rightly done that are not reviewable on error, and the burden is on him who asserts the contrary to show, not simply a mistake in judgment, but an injustice, an abuse of discretion, before the review will be entered upon.   As bills of exception do not lie to acts done in the exercise of discretionary powers, such acts are not reached by an appeal and an assignment of errors in the ordinary way.   We have held therefore that as mistakes made in the use of a judge's discretion cannot be assigned for error, they cannot be reached and corrected, unless an abuse of this power be alleged; but the idea that a judge can abuse, or misuse, any power with which he is clothed by the law or which is incident to his official position and not be subject to review, when the wrong done is made to appear, never had a foothold in this, nor as I believe in any other appellate court, on either side of the Atlantic.   The question in this court has been one rather of form than of substance.   As error can not be assigned to the exercise of a discretionary power unless an abuse of discretion is alleged, and as lawyers and suitors are ordinarily reluctant to make this allegation, it rarely happens that we are compelled to look into the manner in which these powers are used in the lower courts.   It does sometimes happen however, and so recently as Peterson v. The Atlantic City Ry. Co., 177 Pa. 335, this court reversed the common pleas No. 1 of Phila. for the refusal to continue a cause when it was reached for trial on the list.   A clearer case of the exercise of a discretionary power could hardly be named than that of determining whether a cause regularly reached for trial should be tried or continued.   It was alleged to be an abuse of discretion to order the trial to proceed under the circumstances surrounding this case, and a new trial was ordered.   The opinion filed by our Brother DEAN amply vindicates the judgment.   The same order was made in Schimpton v. Bertolet, 155 Pa. 638,

when a continuance had been improperly refused, and for the same reason, viz : that the refusal was unreasonable and in effect an abuse of the discretion of the lower court. The legislature of this state seems to have been of the opinion that the power of revising the exercise of discretion is not only constitutional but desirable. The act of April 8, 1826, restoring the circuit courts which had been abolished by the act of March 11, 1809, provided for an appeal in just such cases. It declared that any suitor dissatisfied with the judgment or decision of the said circuit courts on any demurrer, special verdict, case stated, points reserved for consideration on the trial, motion in arrest of judgment or for a new trial, or to set aside a judgment discontinuance or non pros., may appeal to the Supreme Court. This act as will be seen gave the right to appeal from the decision by the trial judge of motions for a new trial in all cases in which the unsuccessful party was dissatisfied, regardless of whether the action of the court amounted to an abuse or misuse of its discretion, or not.

The only controversy over the extent of the power of an appellate court in the premises seems to have been upon another question. In the Supreme Court of the United States the power of an appellate court to reverse and order a new trial for excessive damages is recognized. It is also said in Gilmer v. Kennon, 131 U. S. 22 that the appellate court may give the plaintiff the option to remit a named sum from the verdict or to have the verdict set aside and a new trial ordered, but that an appellate court cannot enter a judgment for a sum fixed upon by itself, either less or more than the verdict rendered, for this would be to assess the plaintiff's damages which an appellate court is not authorized to do. The same rule was held in 124 U. S. 510 and in 130 U. S. 69. The provision in the constitution of the United States relating to this subject is as follows : " the right of trial by jury shall be preserved ; and no fact tried by a jury shall be otherwise re-examined in any court of the United States than according to the rules of the common law." The United States courts hold in' effect in the cases cited that setting a verdict aside for its excessive character is a reëxamination of the facts that is in accordance with the rules of the common law and therefore no infringement of the right of trial by jury. So it was said in Albin v. Kinney, 96 Ill. 214

that "the rule is uniform that when there is a motion for a new trial on the ground of excessive damages the plaintiff may if he chooses remit a portion of the verdict to obviate the objection." This, if done, is his act.   The court may give him the option, but cannot compel him to remit.   He may refuse, and take his chances before another jury.   The general rule undoubtedly is that an appellate court will not ordinarily reverse because the damages are excessive, but the cases in which it will do so are well stated in a note on page 588 of vol. 16 of the Am. and Eng. Encyclopedia of Law.   "If on the nature of the case, or on a proper return of all the evidence, the point can be raised in the appellate court, as under the practice in many of the states it can, and it then clearly appears that the damages found are excessive, the judgment will be reversed on that ground." Numerous cases are cited in support of this rule from New York, Illinois, Minnesota, Rhode Island, Tennessee, Missouri, Wisconsin, Kansas, Louisanna and Kentucky.   The application of the rule is modified to some extent in some of these states by statutes regulating the practice in the courts, but the general rule remains substantially as stated.   The difficulty has been in many cases to get regularly before the appellate court all the evidence necessary to show that the verdict was so excessive as to justify the belief that it was the result of partiality, mistake or positive misconduct on the part of the jury; but where the data were all before the appellate court, and the conclusion that the verdict was grossly excessive was clear, the courts, unless restrained by some positive statute, have been prompt to vindicate the administration of the law and the rights of suitors by setting aside the erroneous verdict.   In this case the evidence is all regularly before us.   From an examination of it we are satisfied that the verdict is excessive, so excessive as to justify the belief that its amount must have been determined by partiality, or prejudice, or by some misconception of the law or the evidence.   It should have been set aside in the court below.

Whatever may have been said about the subject prior to the passage of the act of 1891, we have no doubt that under that act we have the power to set the verdict rendered in this case aside, nor that it is our duty to exercise it.   This act is constitutional.   It in no way interferes with the right of trial by jury.

It merely gives us ·general authority to do that in any proper case, which we should otherwise have done only upon a distinct allegation of an abuse of judicial discretion by the trial judge.

GREEN, J., concurs in the treatment of the case expressed in the foregoing opinion.

CONCURRING OPINION OF STERRETT, C. J., Jan. 4, 1897 :

It is impossible for any one to calmly and dispassionately consider this record, including the testimony, etc., incorporated in the bill of exceptions, without being forced to the conclusion that the trial of this case resulted in a miscarriage of justice, due partly to error of the court, both before and after verdict, and partly to the abrupt withdrawal of the defendants and their counsel from the court room before all the testimony was introduced. The error " before " verdict, as recited in the fourth specification, consists in what the learned trial judge said in the presence and hearing of the jury in relation to the defendants' testimony introduced for the purpose of disproving malice, and in mitigation of damages. He evidently misapprehended the purpose of the testimony and erroneously assumed that it was in justification of the alleged libel. This was a radical and most damaging error, and one which, in my judgment, ought to be made a principal ground of reversal.

If the general charge were properly before us for review, it would clearly appear that the learned judge consistently adhered to this erroneous position throughout, and instructed the jury accordingly. For example, in that part of his charge recited in the third specification he said : " Where a defendant charged with libel justifies the publication by pleading the truth, such a defense, if not established, may be considered by the jury as a reason for imposing additional damages for the persistence in asserting as truth that which has failed to be proven."

If the defendants had introduced testimony for the purpose of justifying the libel, etc., this instruction would not have been improper ; but, as I understand the record, there was not only no offer to justify, but the testimony in question was introduced for another and an entirely different purpose.

This reference to the third specification is not made for the purpose of treating it as a valid assignment of error, but to

show how tenaciously the learned trial judge clung to the erro-
neous position he had assumed, as recited in the fourth specifica-
tion, which is properly before us on special exception. The
inevitable tendency of the error covered by that specification
was to influence the minds of the jury and swell the damages,
both compensatory and vindictive. To what extent it did so,
we, of course, have no means of judging. Without spending
further time in elaborating this point, I would sustain the fourth
specification of error, as an independent ground of reversal and
one that ought not to be ignored.

The error "after verdict" was in discharging the rule for new
trial. A majority of the court agree that, in the circumstances
of this case, as they appear from the record before us, the court
below in the exercise of a sound judicial discretion should have
set aside the verdict. That position is so thoroughly fortified
by what is said, in the opinion of this court, by our Brother
Mitchell, that further discussion of the subject would be super-
fluous. While, as a general rule, it is undoubtedly true that
matters, resting in the sound discretion of inferior courts, are
not reviewable here, still, when it clearly appears that the judi-
cial discretion thus vested has been manifestly abused to the
serious prejudice of a suitor, it is equally true that this court
has the power, and it is its duty to interpose and afford the
necessary relief. That power—to be exercised only in clear
and proper cases—existed long before the passage of the act of
May 20, 1891, P. L. 101. Properly construed, that act is
merely declaratory of pre-existing powers of this court; thus
understood, the constitutionality of the act requires no defense
at our hands.

The individual opinion of our brother who writes for the
court, suggesting that, under the provisions of said act, a better
disposition of the case before us would be a conditional order
giving plaintiff the option to accept a specified portion of the
judgment and release the residue, or to submit to an order
granting a new trial generally, requires a passing notice. I
cannot assent to any such proposition, because (1) It is illogi-
cal as well as unjust to both parties. A majority of the court
agree that at least one of the specifications of error should be
sustained. The logical sequence of this is that, on account of
mistrial in the court below, the judgment must be reversed and

a venire facias de novo awarded: To that right of retrial by jury both parties are constitutionally entitled, (2) The act of 1891, properly construed, gives us no authority to resolve ourselves into a trial court, and after guessing at the amount of damages the jury should have found, compel the plaintiff to accept that sum or submit to a new trial. (3) If the act, in express terms, gave us the power to make such conditional orders, it would—at least to that extent—offend against article 1, section 6, of the constitution, which declares : " Trial by jury shall be as heretofore, and the right thereof remain inviolate."

The incidents of " trial by jury " are familiar to every lawyer and intelligent layman. They begin with empanelling the jury and end with entry of judgment on the verdict. Before judgment, the trial court may set aside the verdict generally or make a conditional order such as is suggested we should make in this case. We have never had any such power, nor can it be constitutionally given to us. The legislature, in the act of 1891, has indicated no intention to confer it. Every power therein specified may be otherwise legitimately exercised.

These thoughts might be elaborated and fortified by citation of authorities ; but inasmuch as the individual suggestion referred to is not a factor in the decision of this case, it is unnecessary to say more at this time.

As above stated, I concur in reversal of the judgment, but I would also sustain the fourth specification of error.

OPINION BY DEAN, J., January 4, 1897 :

The plaintiff, in his statement, claimed damages in the amount of $50,000 for an alleged libellous publication by defendants ; the jury awarded him $45,000, and defendants appeal, alleging errors on part of both court and jury, which errors are set out in thirteen assignments. The first two may be treated as one, for they involve a discussion of the same principle.

1. The verdict was excessive.

2. The court below erred in not setting aside the verdict as excessive.

In my view of the law, it is not our duty to weigh this evidence, that we may determine whether the fact be as averred in these two assignments; for, I hold it demonstrable on both

reason and authority, that sitting as an appellate court for the correction of errors of inferior courts, we have no power in this particular over this verdict.

The action is a common law action; it is older than the earliest of our constitutions. The rules that define the functions of the court and jury in the trial, are well settled. Nor is there any real dispute here as to these rules.

· First, the plaintiff averred, and offered testimony tending to prove he had suffered substantial damages from a false publication by defendants; the publication was not denied, but defendants offered evidence tending to prove the character of plaintiff was such that he was entitled to no more than nominal damages.

· Second, plaintiff averred, and adduced evidence tending to prove, a deliberate attack upon his character for the gratification of personal malice, and claimed punitive damages in addition to actual damages. The defendants denied the existence of actual malice, and adduced evidence in support of this denial.

The issue was, therefore, one of fact on conflicting evidence. What damage had plaintiff suffered? If the attack was prompted by personal malice, what additional damages ought defendants to pay as punishment, and which should also deter other evil disposed persons from the commission of like offenses? No court in this commonwealth has ever doubted, no court undertaking to give effect to the settled principles of the common law as invariably held in this commonwealth could for one moment doubt, that the answers to both questions must be given by the jury; and they did answer by a verdict, which appellant argues is excessive, therefore error, and for that reason we should reverse the judgment.

To pass upon this alleged error, we must first determine the fact, as to whether the verdict is excessive; we must take up the printed evidence in the paper-books, read, analyze and weigh it. The first difficulty that faces us, is, the jury has not, nor was it their duty to do so, specified the amount awarded plaintiff, as actual damages for injury to his reputation, or what amount, if any they awarded as punishment; for this last, they may not have awarded anything. If we certainly knew they had found as a fact, the publication was not prompted by malice, that would be important in determining whether the damages

awarded exceeded any probable loss to plaintiff in reputation, that is, whether the amount exceeded compensation. But even then, our conclusion would be the merest guess work, for on this point there was conflicting evidence, some of it tending to show good character, and some of it the contrary. It adds no force to the argument to say, that, if we had been sitting as jurors, we would not have rendered such a verdict. A trial judge may say, "I would not have so decided, if I had been on the jury," because, he has had the same opportunity, as the jury, to form an opinion; and he may go further, and say, the verdict is against the manifest weight of the evidence, and he, or the court in banc, may set it aside, and grant a new trial; but we do not know what we would have done, had we been sitting as jurors, because we cannot know from these paper-books what the evidence was in the case. That consists, not alone in what the witness says, but also in his manner, his emphasis, his evasions, or his candor; not alone in what is testified to by the mouth of the witness, but, in what is apparently kept back, which might have been said; the very demeanor of the parties during the trial, all these and more are part of the testimony, which tends to form belief or disbelief in the minds of the jury. How can we, sitting here, determine the truth, with even proximate certainty, when we cannot tell whether $25,000 of this verdict was given as punitive damages, and the remainder as damage to reputation; or, if all given as damage to reputation, whether the reputation was good or bad. In some cases, such as a violated contract, we can ascertain, by applying the measure of damages fixed by the law, whether the verdict is inadequate or excessive; in many cases of physical injury or loss of life, the law lays down a fixed rule for the estimate of damages, which enables us on undisputed evidence to determine with reasonable certainty, whether the verdict is in violation, not of evidence, but of law. But in the face of conflicting evidence as to whether a plaintiff bore a good character in the community, and if good, how much it had been damaged by a libelous publication; whether an attack upon his character was to gratify personal malice, and if so, to what extent the malicious person should, in view of all the circumstances, be punished in damages, to deter him and others from like wrongs, a court of errors and appeals, from its very constitution, is not

competent to determine; it cannot know the facts, for the evidence is not fully before it; therefore, being in ignorance of the facts, it ought not to guess at the truth and apply the law, as if firmly convinced of the truth.

Not only does the plainest reason forbid us to tamper with the verdict of this jury, but the settled law for more than a century commands us to refrain from such action.   I do not favor a blind adherence to the principle of stare decisis.   Where, in the progress of civilization, the reason for the common law no longer exists, the law should give way or be moulded to accord with existing reason.   But when the common law has been adopted as part of the fundamental law of the commonwealth, whether with reason or without, we must declare that to be the law.   Antedating any of our present constitutions, the principle as announced in Bushel's case, Vaugh.'s Rep. 135: "The jury responds to the facts, the judge to the law," has served to define the functions of the court and jury, not only in England, but in this commonwealth, from its earliest foundation.   And while in England, since the institution of trial by jury, and here since its adoption, there has existed a power to correct a false verdict, that power, in practice, never lawfully existed in a distinctively appellate court.   The first remedy was by attaint; a jury of twenty-four being called to review the findings of fact by the first twelve; if the verdict of the second was different from the first, it was followed by the infliction of the severest penalties upon the mistaken jurors, extending even to the forfeiture of lands and chattels.   This barbarous proceeding was in force many generations, until displaced by the more humane one of granting new trials by the court sitting in banc, of which court the trial judge was a member.   This was not a court of errors sitting to review judgments of inferior courts, but the court in which the trial was had determining before judgment, whether the trial judge had erred in law or the jury in fact, and whether judgment should be entered.   In theory, it was wholly in the discretion of the court thus constituted, whether a new trial should be granted; and although fixed rules were adopted by the court itself, guiding and limiting it in the exercise of discretion, this in no degree negatives the possession of discretionary power.

Without citing the many cases showing the practice of the

English Courts, in rules for new trials in actions for torts, before judgment, a single one illustrates the controlling principle. Huckle v. Money, 2 Wils. 205, decided in 1763, only thirteen years before the adoption of our first constitution, was a motion for a new trial in this form of action. Lord C. J. CAMDEN said: "The few cases to be found in the books of new trials for torts, show that courts of justice have most commonly set their faces against them; and the courts interfering in these cases would be laying aside juries; before the time of granting new trials, there is no instance that the judges ever intermeddled with damages." This, it will be noticed, was not the opinion of an appellate court, but that of the court sitting in banc, on a motion for new trial before judgment. It had the undoubted power to revise the verdict of the jury, yet it limited the exercise of its discretion so as not to interfere with the discretion of the jury.

In this brief reference to English trial by jury, before the adoption of our first constitution, the Courts of Star Chamber, the High Commission Court, the Council of York, and like courts, have not been adverted to. They are all odious in English judicial history, and are seldom mentioned by English jurists without shame. They did, sitting as courts of errors and appeals, review findings of facts by juries, set them aside, then fined and imprisoned the jurors. But, their now admitted usurpations, continued but for comparatively short periods, and as precedents, their judgments and the authority for entering them are worthless.

What seems to be undeniable, is, that up to the adoption of our first constitution, in 1776, whether judgment should be entered on the verdict of a jury, was in the discretion of the court in which the verdict was rendered, and that discretion was exercised only in rare cases. After judgment, there was no remedy by appeal to a superior court which would reach the verdict on a question of fact found by the jury, when the evidence was properly submitted to them. Blackstone, Book III., page 407, says: "But, fourthly, the principal method of redress for erroneous judgments in the King's Court of Record, is by writ of error to some superior Court of Appeal. . . . The writ of error only lies upon matter of law arising upon the face of the proceedings. . . . there being no method of reversing an

error in the determination of facts but by an attaint, or a new trial to correct the mistakes of the former verdict."

Our constitution of 1776, chapter XI., provided: " That in controversies respecting property, and in suits between man and man, the parties have a right to trial by jury which ought to be held sacred."

There was no attempt to define trial by jury, and our courts held, that it meant trial by jury as then existing in England; while it has been doubted, whether this language was not intended to leave open to the legislature the authority to establish such method of trial by jury as it thought wise, there has never been doubt as to the judicial construction of it.

After our independence, whatever may have been judiciary legislation or judicial exposition in England, neither is of binding authority upon our courts. The constitution of 1790, article IX., provided: " The trial by jury shall be as heretofore, and the right thereof remain inviolate." The constitutions of 1837 and 1874, reiterated the exact words of this provision. It may be admitted that if there had been in this state a judicial construction of this language under the constitution of 1790, which determined that, notwithstanding the settled law as to right of trial by jury in England before the revolution, there was power in the Supreme Court to set aside, revise, alter or modify the verdict of a jury on disputed facts, then the adoption of the same language in the constitutions of 1837 and 1874, without any qualifying or prohibiting words, must be taken as an assent to the judicial construction immediately theretofore given. Or, if the legislative construction had been that such power existed in the courts, and such construction had been concurred in by the Supreme Court, then " trial by jury as heretofore," might, on sound judicial exposition, have been held to be a power in the Supreme Court to pass upon the facts; and this, even though in the earlier days of the commonwealth, under the constitution of 1776, an opposite doctrine had been held; and even though we now thought the first construction the right one. For example, suppose in Eakin v. Raub, 12 S. & R. 331, decided in 1825, instead of a dissent, the opinion of GIBSON, C. J. that the Supreme Court had no power to pass upon the constitutionlity of an act of assembly had been the opinion of the court, and had remained the law down to the

adoption of the constitution of 1837; if that instrument did not declare differently, the judicial construction of the jurisdiction of the court would have been established thereafter by the constitution, from the mere fact that the convention did not overturn it and expressly confer such power. And this was the opinion of Judge GIBSON himself, for in Menges v. Wertman, 1 Pa. 218, decided in 1845, in pronouncing the judgment of the court, he says, in referring to his dissenting opinion in Eakin v. Raub, "My theory, however, seems to have been tacitly disavowed by the late convention (that of 1837), which took no action on the subject, though the power (that is, the power to declare an act of assembly unconstitutional) had been notoriously claimed and exerted." To the same effect, are Byers v. Commonwealth, 42 Pa. 89, Wynabmer v. People, 13 N. Y. 378, Frigally v. Memphis, 6 Cold. (Tenn.) 382, that where there have been several constitutions, the right of trial by jury has reference to its existence and practice before the last one.

Up to the adoption of our present constitution of 1874, the Supreme Court had over and over again expressly disclaimed judicial power to revise the verdict of a jury on questions of fact. The convention which framed that instrument embraced as members over one hundred lawyers, many of them of great eminence and learning, two of them, BLACK and WOODWARD, ex-Chief Justices of this court. It may, therefore, be presumed the convention knew just what line had been settled upon as separating the functions of the jury from those of the Supreme Court, and it must be further presumed that when it was declared "trial by jury shall be as heretofore," that trial by jury was just what the highest court in the commonwealth had repeatedly declared it to be. What the power of the Supreme Court is over verdicts on disputed facts is best answered by itself.

In Ross et al. v. Rittenhouse, 2 Dallas, 160, decided in 1792, McKEAN, C. J., used this language:

"The genius and spirit of the Common Law of England which is law in Pennsylvania, will not suffer a sentence or judgment of the lowest court, founded on a general verdict, to be controlled or reversed by the highest jurisdiction, unless for error in matter of law apparent upon the face of the record. . . . The advantage of viva voce evidence over written, in the inves-

tigation of truth, will hardly be controverted at this day, in the United States; and the Court of Appeals had not the opportunity of seeing the witnesses on the trial, or of so well knowing the credit due to them respectively as the jury."

In Gaskell v. Morris, 7 W. & S. 32, the court speaks thus: " The seventh and last error, is an exception to the amount of damages recovered, which is alleged to be excessive. . . . If the fact were so that the damages assessed by the jury were excessive, the only remedy for relief within reach of the defendant below was an application to the court before judgment rendered on the verdict for a new trial." In Hamet v. Dundass, 4 Pa. 178, the court says, in passing on a similar assignment of error : " Whether there is evidence to justify the verdict is not for us to determine, but that there was some testimony for the consideration of the jury on each of the points on which the cause turned no reasonable doubt can be entertained." In Moser v. Mayberry, 7 W. 12, the argument in the Supreme Court was, the jury manifestly erred, and the court below ought to have sent them back to reconsider their verdict, but as to this it is said: " But admitting that the jury were mistaken in their conclusion on the facts, the ordinary remedy is by a motion for a new trial. The court may and frequently do recommend the jury to reconsider their verdict; but it has never been held, that this is a matter of right on which any party can insist, and that a refusal to do so would be error. This would make the court in the last resort judges of the fact as well as of the law." In Faunce v. Lesly, 6 Pa. 121, the Supreme Court speaks thus : " The direction was right, but the verdict was wrong, and what was the remedy ? Certainly, not a writ of error; for it would eventually be as prejudicial to the great ends of justice for this court to correct the errors of the jury, as for the jury to correct its judgments in the last resort. Each has its peculiar province, and will best perform its functions within the precincts of it." In Pa. R. R. Co. v. Allen, 53 Pa. 276, where one of the complaints was that the damages were excessive, this court said : " There must always be danger of such assessments, if a jury is at liberty to fix a valuation upon something that cannot be valued. (Referring to plaintiff's pain and suffering.) But this is irremediable by us. The only palliation that remains in such a case—it is not a cure—is the

free exercise of the power which the court of common pleas has to grant new trials."

In Pa. R. R. Co. v. Goodman, 62 Pa. 329, decided in 1869, four years before the convention met, it was argued the verdict was excessive. AGNEW, J., delivering the opinion of the court, says : " From the facts before us, we think the verdict ought to have been different and that the court below should have set it aside. Yet we perceive no means of reaching the injustice on a writ of error, without ourselves undertaking to decide the facts which fell within the province of the jury. The credibility of the witnesses, together with the varied facts and contradictions in the testimony, necessarily carried the case to them. . . . Finding no error we can reach, the judgment must be affirmed." Then follow cases decided after 1874. On an averment of the same error in Vallo v. United States Express Company, 147 Pa. 404, this language is used : " As to the sixth and seventh assignments of error, it is enough to say that the only remedy for an excessive verdict is a motion for a new trial, and that the refusal of such trial is not assignable for error."

In Railroad Co. v. Spicker, 105 Pa. 142, the present chief justice delivered the opinion of the court as follows : " Under proper instructions by the court as to the measure of damages, it was the exclusive province of the jury to determine the amount thereof, subject of course to the power of the court to set aside the verdict in case the damages awarded were clearly excessive, and the plaintiff below refused to remit such excess. In view of the testimony, the damages in this case appear to us to be exorbitant ; but we have no power to grant relief on that ground alone. The power to do so was exclusively in the court below, and its refusal to exercise the discretion with which it was invested is not the subject of review here." Gray v. Commonwealth, 101 Pa. 380 : "It would have been bald error for the court below to have excluded the testimony. We are in no sense responsible for the view the jury took of it, and it would be dangerous, even if we had the power, to attempt to review their finding." Commonwealth v. Railroad, 165 Pa. 44: "The allowance or refusal of this motion (for a new trial) was within the discretion of the learned court below, and it is not a matter of review on this appeal." McKenney v. Fawcett, 138 Pa. 344, PAXSON, J., " The only error assigned is that the court below

refused to grant a new trial.   That such refusal is not review-
able here, is too well settled to need the citation of authority.
'Let us have peace.'"

In addition to these, many more cases might be cited to show
that in an unbroken line of decisions, this Court held that the
question of damages on conflicting evidence was exclusively
for the jury; that the correction of any error in their finding
was solely in the discretion of the court below before judgment;
that as a court of errors and appeals, the Supreme Court, on a
question of excessive damages, had no power to review the find-
ings of fact by the jury, nor the decision of the trial court in
refusing a new trial, and to assume such power would be an
infringement of the right of trial by jury.   And this was so held,
not because of absence of legislative authority, but for want of
constitutional power.

As illustrative of the correctness of this judicial limitation of
constitutional power, we have the corroborative construction of
the United States Supreme Court.   While the federal consti-
tution of 1789 provided for a trial by jury in all criminal pros-
ecutions, it was silent on the subject of civil actions.   After
its adoption, it was claimed that this silence was equivalent to
abolition of the jury in such cases; public opinion demanded
its preservation, and the amended article 7 was adopted, which
provided: "In suits at common law where the value in con-
troversy shall exceed twenty dollars, the right of trial by jury
shall be preserved, and no fact tried by a jury shall be other-
wise reëxamined in any court of the United States than accord-
ing to the rules of the Common Law."

This only expresses the same intent which the courts of this
state have decided is expressed by the words of our constitu-
tion: "Trial by jury shall be as heretofore."   In United States
v. Monson, 1 Gall. 20, it was so decided, the Court, Justice
STORY delivering the opinion, saying: "The common law here
alluded to is not the common law of any individual state, but
the common law of England; according to which, facts once
tried by a jury are never re-examined, unless a new trial be
granted in the discretion of the court before which the suit is
depending, for good cause shown."   And in a late case in same
court, Railroad Co. v. Fraloff, 100 U. S. 24, this unmistakable
language is uttered: "No error of law appearing upon the

record, this court cannot reverse the judgment, because, upon examination of the evidence, we may be of the opinion that the jury should have returned a verdict for a less amount. If the jury acted upon a gross mistake of facts, or were governed by some improper influence or bias, the remedy therefor rested with the court below under its general power to set aside the verdict. But that court finding the verdict was abundantly sustained by the evidence, and that there was .no ground to suppose that the jury had not performed their duty impartially and justly, refused to disturb the verdict, and overruled the motion for a new trial. Whether its action in that particular was erroneous or not, our power is restricted by the constitution to the determination of questions of law arising upon the record. Our authority does not extend to a re-examination of facts which have been tried by the jury under instructions correctly defining the legal rights of parties." I do not cite these decisions as binding upon us, but as showing that so eminent a judicial tribunal as the Supreme Court of the United States, under a provision like unto ours, also disclaimed any constitutional power to revise the verdict of a jury on the facts.

An examination of the convention debates on this section of article 1, shows prolonged and earnest discussion, participated in by all the ablest lawyers. Every amendment tending to lessen the power of the jury as theretofore established, although many and persistent attempts to amend were made, was voted down, and on final reading, the section, as embodied in the constitutions of 1790 and 1837, remained unaltered. Instead of restricting the right of jury trial on questions of fact, by subsequent provisions they enlarged it. This court had decided, that the landowner who claimed damages for appropriation of his land by a corporation, exercising right of eminent domain, was not entitled to a trial before a common law jury; the convention declared, that thereafter, such trial should not be denied him. The legislature had by statute, limited the right of the jury to assess damages in negligence cases, to $3,000 for personal injury, and to $5,000 for loss of life; the constitution prohibited the legislature from, thereafter, placing any limit in this particular, on the power of the jury. So tenacious was this convention, for the theretofore established right of the jury, that it was only after much opposition, the clause, permitting

litigant parties in civil actions by agreement, to submit the facts to the court without the intervention of a jury, was adopted. We must therefore consider, in determining the scope of this provision, that at the date of our present constitution, "trial by jury as heretofore" meant just such trial as for more than seventy-five years, had been settled by the repeated solemn adjudications of the highest court of the commonwealth.

But it is argued, the act of 20th May, 1891, confers upon us power to review the findings of fact by a jury, and either change or modify the verdict, or grant a new trial, if we deem the damages excessive. The section relied on is as follows :

"The Supreme Court shall have power in all cases to affirm, reverse, amend and modify a judgment, order or decree appealed from, and to enter such judgment, order or decree in the case as the Supreme Court may deem proper and just, without returning the record for amendment or modification to the court below, and may order the verdict to be set aside and a new trial had."

It is not altogether clear, the legislature, by this act, intended anything more, than to confer upon us the authority to make such record entries after hearing appeals, as would speed the final event of the cause. It may be construed, as merely authorizing us to make such orders as were formerly made by the court below after the record was sent back with our decision. In some particulars, it is almost a repetition of the act of June 16, 1836, the first section of which authorizes us "to examine and correct all and all manner of error of the justices, magistrates and courts of this commonwealth, in the process, proceedings, judgments and decrees, as well in criminal as civil pleas or proceedings, and thereupon to reverse, modify or affirm such judgments and decrees or proceedings as the law doth or shall direct." The act of 1722 gave authority only to reverse or affirm ; in all cases the record went back to the court below. In criminal proceedings a simple reversal of the judgment, often, meant the discharge of the prisoner ; unnecessary delays, also, resulted in the correction in the court below of errors, which could just as readily have been corrected in this Court and the corrected judgment sent back with the record. In construing this act, this court held, that on a determination of an error in law in a judgment, whether criminal or civil, it would be cor-

rected, where possible, in the Supreme Court before transmitting the record. Thus in Thomas v. Brady, 10 Pa. 164, it was held, that even though there was error in rendering a general instead of a special verdict in assumpsit, yet as a calculation disclosed the same verdict ought to have been rendered on a special count, the judgment should be affirmed, and not sent back for retrial. And so, where judgment has been entered on a verdict generally against three, and there had been issue but as to two of defendants, who appeared and defended, the judgment was reversed as to one who had not pleaded, and affirmed as to the other two. Also, in a criminal case, where the prisoner had been sentenced to a longer term than the maximum authorized by law, the court modified the judgment to accord with the law. But the court, never, in any of the cases where the act was invoked, undertook to change the finding of facts by the jury, except where, from the record itself, the law demanded a change or modification, and such change could be made without infringing on the right of the jury to determine the facts from contradictory evidence. And so here, if the intention of the act of 1891 is the same as that of 1836, it is, without question, constitutional.

No one doubts the power of the legislature to regulate and change the practice, so as to facilitate trials by jury, and relieve parties from useless and protracted litigation. But if, as argued by appellant, the intention of the act of 1891, is to authorize this court to review the evidence and modify the judgment so as to accord with our finding of the facts, I hold it to be palpably unconstitutional. The plaintiff has a right to trial by jury as heretofore; that is, twelve men must be called from the panel drawn from the body of the county; in their selection, he has a right of challenge peremptorily and for cause; the jury shall see the witnesses, hear the evidence, the argument of counsel, the charge of the court, then they can render a verdict, if the whole twelve be agreed; and if the court in which the trial is had, approve the verdict, and no error of law has been committed, the plaintiff has a right to the fruits of his judgment. This is "trial by jury as heretofore," the right whereof is to remain inviolate.

By this act, it is argued, we are to review the evidence, from printed paper-books, determine the jury awarded too much, reverse the judgment and grant a new trial, or determine that

it exceeds, by $25,000, $30,000 or some other sum, what the conflicting evidence warranted, and enter judgment accordingly, under the authority to "reverse, amend and modify." That is, seven judges, or a bare majority of them, not of the vicinage, resident in different parts of the state, with no right of challenge to either party, peremptorily or for cause, with no opportunity to see or hear the witnessess, in this common law action are to determine the truth from this conflicting evidence. Is this "trial by jury . . . . as heretofore," the right whereof is to remain inviolate? It is urged, that even if we do not modify the judgment, we can, if in our opinion it is excessive, reverse for that reason and order a new trial. But as I think I have shown, we have neither the opportunity nor the authority to pass upon the evidence to determine the fact. If the statute could confer on us authority to invade the province of the jury at all, we would not need to put these parties to the expense and vexation of a second trial, and thus perhaps have the case brought back to us to guess again; would not need to say to them, this jury awarded to much; try again, and see if a second jury will not reduce the amount; we could just as lawfully, cut it down at once, to an amount which this jury of judges, or a majority of them, thought it ought to be; for the right to reduce the amount, is just as clear, as the right to touch it, and force a verdict on the next jury by the coercion of our opinion.

. It need scarcely be added, that as both we and the legislature drew our authority from the same instrument, they cannot by a valid statute, authorize us to violate the constitution. If any authority be needed on so plain a question, it will be found in Coal Co. v. Snowden, 42 Pa. 488.

The suggestion, that now, judges in exclusively equity proceedings and in the orphans' court, pass on both facts and law, is without weight. Both are constitutional courts, with appropriate jurisdiction. The people have seen fit to establish judicial jurisdiction with certain modes of procedure in several distinctive courts. That is sufficient for us, or ought to be. We sit here, neither to make constitutions nor to violate them, but to enforce the one plainly before us.

The alleged hardship of the case furnishes no warrant for unlawful relief. The truthfulness of the trite maxim, "Hard cases make bad precedents," would be here most pointedly illus-

trated, if we permitted our judicial action to be controlled by such argument. Is it to be cited hereafter as a precedent, that the legislature and the courts can set aside the clearly expressed will of the people, because they think the constitution operates hardly in a particular case or class of cases ? The wisdom of man never yet framed a government, under which might not occur individual cases of hardship, for which there was no adequate remedy; but such exceptional cases only demonstrate that fallible man is incapable of devising a governmental system which is absolutely perfect. Jurors are not perfect, the judges of the trial courts are not perfect; are the members of this court infallible ? Will our verdict on facts be the very truth ? Will we, on disputed evidence, give for the plaintiff too much, or against the defendant too little ? The suitor, in his search for an infallible tribunal, will hardly find one in this age. The right to life, liberty, property and reputation, depends on that stability of government which comes from inflexible adherence to fundamental law. It is our duty to resist all attacks upon that law, whether by violence or by assumption of unconstitutional powers attempted to be conferred by the legislature. It is generally understood, that in government there are two kinds of revolution : One peaceable, which amends or changes the organic law by the mode pointed out in that law; the other, violence from without, which, in utter disregard of the law, overthrows the government established by it. A third, however, is here proposed,—a stealthy usurpation of power by the legislature, a body appointed and sworn to uphold the law. The first is always justifiable, the second sometimes, the third never. As an historical fact, the second has more than once had its inception in the indignation and passion aroused by the third.

It is not without the gravest apprehensions, that I see this wide departure from the settled law of this commonwealth ; it seems to me, it must end in jury trial rapidly falling into disuse ; there will then, be elimated from our judicial system, one of the chief elements of its strength, and one which has always had the earnest support and warm attachment of the citizen. Although there is some exaggeration, there is much truth in the declaration of the Englishman that " The whole establishment of King, Lords and Commons, and all the laws and stat-

utes of the realm, have only one great object, and that is, to bring twelve men into a jury box."

For these reasons, therefore, I would overrule appellants' first and second assignments of error.

Nevertheless, I would reverse the judgment on the fourth assignment of error. This complains of the following remark of the court: "Mr. Shields: We challenge defendants to prove the article and justify it if they will. Mr. Rothermel: Fortunately, we are in a position in which that is not necessary; as Mr. Smith has proved the truth of it himself while upon the stand. By the Court: It comes down, then, to the same point as counsel alleges, that the article is true. Mr. Rothermel: I will ask for an exception to that remark. Exception granted." This is the only exception touching this ruling of record properly before the court. The same legal conclusion, however, appears throughout the charge, and an attempt is made to have us review it in appellants' third, fifth and sixth assignments of error, but except in so far as the subject of them is necessarily involved in a discussion of the fourth, I do not notice them. If counsel for appellants desired a judgment on them, it was his plain duty to raise the question by a properly verified assignment of record. The remark of the court in the hearing of the jury, was, in substance, a declaration that the defendants pleaded justification, by asserting that there were reasonable grounds at the time of publication to induce belief in its truth. A single remark of the court during the progress of the trial, indicating at the time an erroneous view of the law, and which is corrected subsequently in the charge proper, would constitute no ground for reversal. But, where the announcement of the law to counsel from the bench, is followed by explicit instructions to the jury conveying the same erroneous idea, we may well treat it as harmful to the complaining party.

I do not think the evidence offered under the general issue, in mitigation of damages, amounts to the same thing as alleging that the article is true; both the evidence tending to show that plaintiff had left the city when financially involved, which plaintiff himself admitted, and other evidence reflecting on his general character for honesty, was admissible, not for purpose of establishing the truth of the publication, but that at the time

defendants had reasonable grounds to believe it true; and this solely in mitigation of damages.

Under the general issue, what may be given in evidence in mitigation of damages, is a question not free from conflicting decisions. Assuming, the cause of action has been established, the character of evidence that may be given by plaintiff to aggravate damages, is not a subject of doubt, but what evidence the defendants shall be permitted to offer in mitigation, is by no means clear; and what shall be the effect on the verdict, if the evidence offered does not come up to a supposed standard of proof, is not free from doubt. In this state, in Henry v. Norwood, 4 Watts, 347, an action by a clergyman for libel there was no plea of justification; the defendant offered to prove the general character of plaintiff was bad; the court rejected it. As to this ruling, this court says: " With respect to the evidence offered for purpose of showing that the general character of plaintiff was bad, we think it ought to have been received, and that the court below were wrong in rejecting it. That such evidence is admissible, may be clearly deduced from the ground itself upon which the plaintiff must rest his claim to damages. In his declaration, he complains, that being of good character as a minister of the Gospel, and also a citizen, and having sustained the same until the publication of the libel by the defendant, he thereby received great injury in his good name so previously had and enjoyed. Now it is apparent that the injury here complained of and alleged to have been produced by the publication of the libel, is the loss of his good character; hence it becomes all important as well as pertinent to the issue, to inquire whether or not the plaintiff had a good character, such as he averred in his declaration; for if he had it not, it was impossible, in the nature of things, that he could either lose or be deprived of it. The testimony was also admissible for the purpose of establishing a measure of justice between the parties; because the extent of the injury, if any, which plaintiff had sustained, depended in some degree at least upon the goodness or badness of his general character before the publication of the libel; and as the amount of compensation ought to be commensurate with and bear some proportion to the extent of the injury, it was altogether proper for the jury who were about to assess the amount, to know what standing and

character the plaintiff had in society anterior to the publication of the libel." The reasons given in vindication of this decision I regard as unanswerable when applied to an action in which the general issue alone is pleaded. Of course, where justification is pleaded, what is said has no application. Nor has the law of the case cited been departed from, since its announcement in 1835. Numerous cases have been decided since, involving the question of what were and what were not attempts to prove the truth of the charge, but in no one has it been held, that defendant could not give evidence of general reputation of plaintiff in mitigation of damages, nor that particular acts given in evidence by plaintiff himself, tending to produce belief of the truth, could not be invoked for same purpose. Smith v. Smith, 39 Pa. 441, cited and relied on by appellee's counsel, is not in conflict with Henry v. Norwood. That was an action for damages, for the slanderous charge of larceny of tobacco, and defendant offered under the general issue to prove by a witness the particular fact charged. In the discussion raised by the assignments of error, THOMPSON, J., remarks on the uncertainty of the law, because of diversity of decisions, and rules that the evidence was inadmissible, only because it tended to prove directly the truth of the charge.

For these reasons, I would sustain the fourth assignment of error and award a venire facias de novo. I would overrule all the others.