## McClellan *v.* Fox, Appellant.

Argued January 31, 1935. Before FRAZER, C. J., SIMP-SON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Henry A. Frye,* with him *Cornelius Haggerty, Jr.,* for appellant.

434

*Joseph L. Fox,* for appellee.

OPINION BY MR. JUSTICE MAXEY, April 1, 1935:

Plaintiff sued defendant for damages arising from injuries alleged to have been received about 6 : 30 p. m., November 13, 1929, when she was struck by defendant's automobile and seriously injured. After trial the jury rendered a verdict for the plaintiff in the sum of $15,375. This was subsequently reduced, upon the plaintiff filing a remittitur, to $10,000. Motions for judgment n. o. v. and for a new trial were refused. Defendant appealed.

At 19th Street and the Parkway in Philadelphia is Logan Circle, with a diameter of 328 feet. Around this circle the Parkway is 90 feet from curb to curb. The plaintiff was going from the east pavement of the Parkway as it winds about Logan Circle, westward to Logan Circle itself. Her testimony is that when she was about to leave the east pavement of the Parkway she noticed that the westbound traffic at 18th Street was held in check; that when she reached the middle of the distance between the east curb and Logan Circle she looked again to the southeast and observed that the traffic on the Parkway was still held back by the park guard stationed at 18th Street; that she continued on toward Logan Circle and when five or 10 feet away from the curb of Logan Circle, she heard the roar of a motor and in an instant she was hit, knocked down and injured by an automobile. The ownership and agency of defendant's automobile were admitted. An eyewitness, David Kahana, testified in behalf of plaintiff that the latter was three-fourths of the way across Logan Circle, when he saw her, and she was going in the direction of the Parkway. This witness also testified that there were two lines of traffic going west on the Parkway and the machine which struck plaintiff pulled out on the left of the traffic and tried to get ahead of the traffic going west. It was traveling, so he said, at a speed of 45 to 50 miles an hour, and struck her when she was about five or ten feet away from Logan

Circle. The plaintiff was going west when the automobile hit her. After striking her, it dragged her, according to measurements based on this witness's testimony, 398 feet. Defendant testified that he went out 16th Street to the Parkway, there turned to the left and took the left-hand lane of cars going out the Parkway. When he got to the circle, he still kept on the left-hand side. He said that the pavement was wet and the atmosphere a little misty and there were cars passing him on the right. He did not know whether it was one or two lanes. As he got half way or three-quarters of the way around the circle, a woman ran between two cars from the right, right in front of his car, and he struck her. He said the accident was unavoidable and that he was not going fast. The defendant declared that the plaintiff was about three or four feet ahead of his car when she ran in front of it. His speed, he claimed, was 20 to 25 miles an hour.

Appellant's counsel in his argument for a new trial contends that the "verdict was founded on a fantastic and impossible story as told by the witness Kahana." Counsel attempts to justify this characterization of Kahana's testimony by this argument: "He [Kahana] says that he saw the automobile of the defendant swerve out of the line of traffic and travel directly toward the spot where Mrs. McClellan was hit. At the time of the swerving she was only three-quarters of the way across and the car was traveling at from forty to fifty miles per hour. While she traveled all of the remaining distance except five or ten feet, in other words, while she was going at least fifteen or twenty feet, this juggernaut traveled twenty-five or thirty feet without changing its course and struck her. The witness could not explain how the car then turned at more than a right angle and proceeded around the circle dragging the body of the plaintiff beneath it. He admitted that if it had not turned it would have gone directly up into the circle, and in response to a question by the trial judge one of the park guards said that the car would have traveled clear up to the foun-

tain." As to this alleged inconsistency, Judge LAMBER-
TON, in his charge to the jury, said: "It has been argued
to you, and you will readily see from looking at this plan
that the accident could not have happened exactly as
stated by Mrs. McClellan or Kahana. There is absolutely
no question that if Mr. Fox's automobile had veered out
of traffic at 40 or 50 miles an hour, and had struck Mrs.
McClellan where she said it struck her, that that automo-
bile could not have then circled around the Parkway and
ended where it did end." He says further: "It has also
been pointed out to you that the story of Mr. Fox is in-
consistent, because he makes a cross here where he hit
Mrs. McClellan. The park guards tell you where they
found the car, and he says that he went about 10 feet after
hitting her, whereas the estimated distance between the
point where the accident occurred and where the park
guards found the car, is 90 feet. In my opinion, although
it is for you to say, those matters are of trifling impor-
tance. If the ordinary person was taken out there to the
Parkway they could show you just exactly where their
car stopped or just exactly where they were hit, but if
you give that ordinary person a blueprint and ask them
to make a mark on it, you are going to get results that
are almost of necessity a few feet off one way or the other,
and if they are made as the result of a natural mistake,
the inconsistencies then disappear."

It is a matter of common knowledge that where the
scene of any accident is near "circles," and where streets
intersect, as in the instant case, it is difficult for witnesses
on the stand, when asked to point out on blueprints the
exact spot where certain events in these circles took
place, to do so with accuracy. Cases of this kind where
alleged inconsistencies appear, such as those complained
of here, are peculiarly for the determination of the jury.
We agree with the court below when in dismissing the
motions for a new trial and for judgment n. o. v., it said,
in an opinion by Judge SMITH: "The testimony raised
real issues of fact that were properly submitted to the

jury. Whenever a question depends upon oral testimony, the credibility of the witness is for the jury. . . . The trial judge gave a full and adequate charge on the questions of negligence and contributory negligence and the responsibility of automobile drivers and pedestrians at and between regular crossings. . . . There is ample evidence upon which to base a verdict for the plaintiff." This is not one of those cases where the testimony alleged to be incredible is proved to be so by incontrovertible physical facts.

In Ensor et ux. v. P. R. R. Co., 306 Pa. 451, 159 A. 872, this court, in an opinion by the present Chief Justice, said: "Throughout, the credibility of the witnesses was the prime consideration in the case; from the conflicting testimony it is apparent many of the witnesses could not have been speaking truthfully. . . . If plaintiff's witnesses were believed, there was sufficient evidence to warrant the jury in returning the verdicts upon which judgments were entered. The credibility of the witnesses was properly a question for the jury and was submitted to them under an adequate charge."

Appellant also contends that plaintiff's story was so inherently improbable that it ought to be judicially declared so. He asserts: "When her garments were brought into court there was not the least sign of dirt which would have inevitably been upon them had such a thing occurred. . . . The only evidence of any injury was the tearing of the left sleeve from the shoulder of the dress, and the coat which was admittedly worn at the time was not even produced." As the trial took place on April 17, 1934, which was four years after the accident, the absence of dirt from the garments would not be conclusive on the question of the probability of the plaintiff's story about being dragged by the automobile. Neither would the fact that the coat was not produced and that the only garment which was produced showed a tearing of the left sleeve. Accidents often have curious results which seem to stamp "improbability" on the reported

version of them. We said in Keck v. Phila. Rapid Transit Co., 314 Pa. 389, 393, 171 A. 478: "Anyone with even a superficial acquaintance with the results of accidents knows that the results sometimes seem to be at variance with the individual's conception of the working of the laws of physics. The trouble is not with the 'laws' but with the individual's 'conception.' These laws always work with exactitude, but the individual's conception may be based either on insufficient data or an inadequate knowledge of the play of physical forces."

The trial judge correctly held that the pivotal fact in this case was the location of the line where plaintiff was crossing the Parkway and that this was for the jury's determination. As to this he stated: "The park guards have said that the regular crossing for pedestrians is just a little bit to the right of the point where Mrs. McClellan has indicated that she crossed, so I think we may say that if she crossed where she says she crossed, to all intents and purposes she was crossing at a regular crossing place, and the rights and duties and liabilities of this case would be governed by the law as given to you respecting regular crossing places. But if she crossed further down, where Mr. Fox says she did, she was crossing at a point removed from any regular pedestrian crossing. Those are vital points for you to consider." He made it clear that the primary issue before the jury for them to determine was the defendant's negligence, and if they found him to be negligent, then to consider the question: Did plaintiff's negligence contribute to the accident. The instructions as to negligence and contributory negligence were accurate and adequate.

Defendant earnestly contends that the verdict in this case even as reduced was excessive. The court below in banc adjudged an award of $10,000 to be proper. We find nothing in the record which would warrant our disturbing this judgment. The plaintiff was rendered unconscious by the blow of defendant's automobile. She remained in the hospital a week. Her hospital record

shows that she had multiple abrasions of the body, lacerations of the legs, shock and possible cerebral concussion. After her discharge on November 20, 1929, she returned to the hospital for further treatment on December 20, 1929, and August 12, 1931. She testified that when she left the hospital on November 20, 1929, she went to her home where she remained in bed for two and one-half months as the result of her injuries; that she was then compelled to use crutches for a period of half a year; that she was treated by Dr. Boston, a surgeon, for a year and a half following the accident; by Dr. Thomas for three years following the accident; that she had been under the professional care of Dr. Scanlon since October, 1932, up to the time of the trial; that she has been examined by a nerve specialist; and that she has been under the professional care of Dr. Baron for a nervous condition since February, 1934, up to the time of the trial; and that in May, 1932, she was examined by a surgeon. The jury had the opportunity of observing the plaintiff, who testified that because of injuries to her left shoulder she could not lift her left hand. The plaintiff testified that she still suffered from a deep-seated neuritis and a surface numbness of her entire left side and continuous pains in her head, particularly on the left side, and dizzy spells, and that as the result of the accident there was a swelling at the left hip of a size of two fists, and that she has trouble walking and is unable to work. There was also competent evidence of her loss of earning power. The testimony in this case, if credited by the jury, as it apparently was, justified the judgment now complained of.

On the question of the alleged excessiveness of the verdict as reduced, what the present Chief Justice aptly said in Knobeloch v. Pgh., H. B. & N. C. Ry. Co., 266 Pa. 140, 109 A. 619, is pertinent: ". . . This court has repeatedly said in a long line of cases, beginning with Smith v. Times Pub. Co., 178 Pa. 481 [36 A. 296], and extending down to Scott v. American Express Co., 257 Pa. 25 [101

A. 96], that the question of the amount of the verdict would be reviewed only where so grossly excessive as to shock our sense of justice and to indicate a clear abuse of discretion on the part of the court below." In the case before us we find nothing in the verdict rendered "to shock our sense of justice and to indicate a clear abuse of discretion on the part of the court below," in not granting a new trial.

The judgment is affirmed.

Mr. Justice Kephart dissented.