Mashinsky et al. *v.* Philadelphia, Appellant.

98

Argued December 9, 1938.   Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Aaron W. White*, with him *John J. K. Caskie*, Assistant City Solicitors, and *Joseph Sharfsin*, City Solicitor, for appellant.

*Robert M. Bernstein*, with him *Milford J. Meyer* and *Louis Earle Lasch*, for appellees.

OPINION BY MR. JUSTICE MAXEY, January 26, 1939:

Plaintiffs, husband and wife, brought an action in trespass against defendant to recover damages for injuries sustained by the wife when she was struck by a motorcycle operated by a policeman in the employ of defendant.

The accident happened at 10:30 p. m., April 11, 1936, in Philadelphia, at the intersection of 11th Street, which runs north and south, and Mt. Vernon Street, which runs east and west, both streets being 26 feet wide between curblines. A single set of trolley tracks runs in the middle of 11th Street and only northbound traffic is permitted on it.

The wife-plaintiff, Helen Mashinsky, testified that at the time of the accident she was crossing 11th Street

from the northwest corner to the northeast corner, at the regular pedestrian crossing of Mt. Vernon Street, that before leaving the curb she looked to the south and seeing no oncoming traffic, she then started across the street, and that when she was a step west of the trolley track she looked again. She then proceeded across and when she was two steps from the sidewalk, on the east side of 11th Street, she heard the noise of a motorcycle, which was then three or four yards from her, and she was struck before she could reach the curb. She was knocked in the air by the force of the collision and did not know anything further until she recovered consciousness at the hospital.

Mr. Williams, a witness for plaintiff, testified that at the time of the accident he and his mother-in-law were crossing 11th Street from the southwest corner to the southeast corner, that he quickly pulled his mother-in-law back from being hit by the motorcycle, which he estimated was traveling from 30 to 35 miles an hour, that the motorcycle cut "across the street in a little diagonal line," that he saw the victim "thrown into the air," that when she was struck she was "in the regular pedestrian crossing" and about 3 or 4 feet from the curb, that she landed about "25 feet from the crossing," and that, after hitting her, the motorcycle "turned on the side and skidded." This witness's mother-in-law gave substantially similar testimony and estimated the speed of the motorcycle at 45 miles an hour. Another witness testified that Mrs. Mashinsky went across the street in the pedestrian crossing and that she "was thrown about 20 feet" from "the corner."

Officer Lee Jones, the operator of the motorcycle, testified that he and motorcycle officer Shanahan were parked along the curb on 11th Street, south of Green Street, which is approximately 200 feet south of Mt. Vernon Street, that in the regular course of their duties they noticed an old Chevrolet car containing four men, going north on 11th Street, that this car had New Jersey

license plates partially obliterated, and was proceeding away from Camden, and that as a result of their suspicions they pursued it, and in the course of the pursuit the collision occurred. Officer Jones stated that after he passed the north intersection of 11th Street at Mt. Vernon he noticed a woman walking from the west to the east side of 11th Street about fifty feet in front of him. He testified: "She had taken about three, perhaps four steps towards the west rail across 11th Street. . . . She got just abreast of the west rail and she stopped and looked in the direction from which Shanahan was going. . . . I was rolling up in the tracks between the rails when this woman stopped. I was then fifteen or twenty feet south of her. I sounded my horn to warn her of my approach and then went to my right. I had plenty of room to get around in case she should run or do anything else. As I was moving she broke into a run and ran into the front of the motorcycle. There was nothing I could do but turn sharply to my left, as sharp as I could possibly turn the wheel, and the right crash bar . . . caught her leg and knocked her to the roadway." He estimated his speed at 20 or 25 miles an hour and said that when he hit Mrs. Mashinsky she was not at the pedestrian crossing but some distance above it.

Officer Shanahan corroborated this witness as to pursuing the car with the New Jersey license, and as to where Mrs. Mashinsky was lying after the accident. He also testified that after he caught the pursued car and waved to the driver to pull it over to the side, he heard "a whirring noise," looked around and saw Sergeant Jones' motorcycle laying over in the street sliding around. He then ran to him and to the scene of the accident. There was other testimony in the case as to how the accident happened. Issues of fact were raised as to the negligence of defendant's employee and the victim's contributory negligence. There was also an issue of fact as to whether or not the police officer whose motorcycle struck Mrs. Mashinsky was at the time in the perform-

ance of an official emergency duty. If such was the fact, the City would be responsible only if his act amounted to recklessness. The burden is on that party who pleads the existence of an emergency to justify his violation of "the rules of the road." Even if a known emergency exists, that does not justify the driving of a motor vehicle with a reckless disregard of the safety of others: *Oakley v. Allegheny Co.,* 128 Pa. Superior Ct. 8, 193 A. 316.

The case of *Reilly et al. v. Phila. et al.,* 328 Pa. 563, is clearly distinguishable from the instant case. In that case, as the opinion points out, the two officers in the police car were "in close pursuit of a fleeing felon in a stolen automobile." It was held that they came within the provisions of the Motor Vehicle Code of May 1, 1929, P. L. 905, which act, "together with its amendments, specifically exempts from the ordinary rules and regulations police, fire and hospital vehicles when engaged upon official emergency duties." As Mr. Justice DREW said in that case: "The general restriction imposed upon the operators of such vehicles is merely that they may not drive in 'reckless disregard of the safety of others.'"

The case at bar is more nearly like that of *Cavey v. Bethlehem,* 331 Pa. 556, where pedestrians sustained personal injuries when struck at a street intersection by a motorcycle driven by a police officer of the defendant city, who admittedly was acting within the scope of his duties at the time, but nevertheless was acting recklessly. This court in its opinion in that case said: "The action of the officer in approaching a busy intersection in a city, at a high rate of speed, at a time when the presence there of pedestrians was reasonably to be anticipated, with his attention focused upon pursuing and clocking a speeding sedan, created a situation of grave peril to all persons upon the highway at the intersection. The probability that such conduct would cause bodily harm to be done to some of them was further increased by the fact that he passed through the intersection at least thirteen feet to

the left of the center line of the highway." The opinion points out that subsection f of section 1002 of the Vehicle Code of May 1, 1929, requires that "vehicles under the direction of the police in the chase or apprehension of violators of the law, shall be operated 'with due regard for the safety of others,' and that the exemption from speed limitations of fire department and fire patrol vehicles traveling in response to fire alarm, or ambulances upon calls of emergency, shall not protect the driver of any such vehicle from the consequences of 'a reckless disregard of the safety of others.' "

All issues of fact were submitted to the jury, and verdicts for the wife plaintiff in the sum of $14,000 and for her husband in the sum of $1,000 were returned. A special finding was made that the accident happened at the regular pedestrian crossing. Defendant's motions for judgment n. o. v., and for a new trial were overruled. Defendant took separate appeals from the entry of the judgments.

Several assignments of error were filed, only two of which require discussion. The sixth assignment is based on the fact that during the trial counsel for plaintiffs requested counsel for defendant to produce a report of the accident, which was signed by Officer Jones, the witness above referred to. Plaintiffs' attorney declared that he "was reliably informed" that this report contained the license number of the automobile which the officers pursued. The purpose of the production of this report was to contradict the officer's testimony that he "did not get" the license number of the automobile. The court directed the defendant to produce the report for inspection. Defendant's counsel then requested the court to grant him permission to state whether the report contained such a contradicting fact. The court then said: "I will look at it. If you both come back [to the Judge's chambers], I will let you both look at it together and see if you can find out what you want." Defendant's counsel then said: "I would like to note on record that

the report of Officer Jones was produced and examined by both Mr. Bernstein and myself under the supervision of the court." If counsel for defendant thought it important that the jury be informed that the report of the officer did not contain the contradicting statement plaintiff's counsel thought it contained, it was counsel's duty to request the court so to charge the jury. This counsel did not do though the trial judge asked at the conclusion of his charge: "Is everything covered?" In its opinion refusing a new trial the court said: "This statement [of the officer] was never produced before the jury and was never offered in evidence. Counsel for the defendant argued at length with reference to the call that was made, which was undoubtedly more of a boomerang to the plaintiffs. We cannot see this as a reason for granting a new trial." We agree with the court below and overrule the assignment.

The seventh assignment of error is based upon the refusal of the court to grant the motion of defendant for the withdrawal of a juror because of certain remarks made in the summation by plaintiffs' counsel. Before quoting these remarks it should be stated that the chief issue in this case was whether the accident occurred at the crossing or in front of certain premises. If at the latter place, the victim would be guilty of contributory negligence and the court so instructed the jury. Three disinterested witnesses corroborated the plaintiff that she was on the crossing when hit. The testimony that she was injured some distance from the crossing was given by an officer who saw the accident and by an allegedly disinterested witness named Matthew Kennedy. In contradiction of Kennedy's testimony plaintiffs' counsel produced a statement signed by the witness in which he had said that the accident happened "at Mt. Vernon Street." His explanation of the variance between this statement and his sworn testimony was that he made it "to get rid of the investigator." The latter testified that Kennedy read the statement carefully be-

104

fore he signed it. Another statement was also produced
by the City to substantiate Kennedy's testimony in its
behalf. In discussing Kennedy's testimony, plaintiffs'
counsel said to the jury: "Someone may have brought
influence to bear on Matthew Kennedy to change his
testimony consciously or subconsciously." Defendant's
counsel then asked that the remarks of counsel be noted
on the record and that a juror be withdrawn. Plaintiffs'
counsel then said: "I do not charge that they did." The
court overruled the motion to withdraw a juror. Plain-
tiffs' counsel then further stated: "Members of the jury,
so there won't be any question about it, I do not charge
it, but I argue that in view of the fact that he has signed
the statement that the accident happened at the intersec-
tion, he read the statement before he signed it." We
agree with the court below that the remarks made by
plaintiffs' counsel did not justify the granting of a new
trial. This assignment of error is overruled.

The assignments of error predicated upon the court's
refusing binding instructions for defendant and refus-
ing to enter judgment for defendant n. o. v., and upon
overruling defendant's motion for a new trial, are all
overruled.

Complaint is also made that the verdict in favor of
Helen Mashinsky for $14,000 was excessive. The record
shows that she sustained lacerations of the thumb and
head which required several sutures and that she also
sustained a compound fracture of both bones of the right
leg. A pin was inserted at her ankle for the purpose of
making traction and reducing the broken leg. The pin
was removed at the end of 6 or 8 weeks, and a cast placed
on her leg. She was discharged from the hospital three
months after her admission. She then went back to the
Out Patient Department. The tibia of the leg did not
unite; the fibula united. At the end of a year after
using various methods to try to stimulate the bone
growth she was re-admitted to the hospital for an opera-
tion. A steel plate was inserted. The tibia refused to

heal. At the time of the trial the plaintiff had no union of the tibia, but good union of the fibula. Appellant states in its paper book: "A future operation might result in the restoration of function, but if this is not successful she will probably have to wear a brace." There was evidence that Mrs. Mashinsky went to the dispensary for treatments fifty-two times. Dr. Calvin M. Smyth testified for the plaintiff, inter alia, as follows: "We have here a woman that has an ununited fracture almost two years after the injury. . . . The reason that this woman's broken leg has not knit is because she is one of those individuals that does not have some natural resources of her own to make it knit." He was asked: "What in your opinion is the future of this bone?" He replied: "The only thing that offers any hope of union I would say would be a bone graft operation." This operation, he said, would require her being hospitalized for three months. He also said that the probabilities of this operation on Mrs. Mashinsky being successful were not greater than 30%. He was asked: "With the probability against the success of the operation, assuming it does not heal after all the surgeons can do is done, what confronts this lady in so far as the use of that leg is concerned? A. The only thing she can do is wear a rigid brace which extends from the upper part of the thigh down to and including her ankle joint. That will hold her leg rigid in spite of the ununited fracture and will allow her to get around walking stiff legged and with considerable inconvenience and discomfort. That is the only other thing she can do. She has to have a bone graft operation and have it take or else she has got to wear a brace." The trial judge, who saw Mrs. Mashinsky in court, declared in refusing a new trial that the verdict was not excessive.

"This court has repeatedly said in a long line of cases, beginning with *Smith v. Times Pub. Co.*, 178 Pa. 481 [36 A. 296], and extending down to *Scott v. American Express Co.*, 257 Pa. 25 [101 A. 96], that the question of

the amount of the verdict would be reviewed only where so grossly excessive as to shock our sense of justice and to indicate a clear abuse of discretion on the part of the court below": *Knobeloch v. Pgh., H. B. & N. C. Ry. Co.,* 266 Pa. 140, 109 A. 619, and *McClellan v. Fox,* 318 Pa. 433, 177 A. 823. Applying this test to the instant case, the verdict stands.

The judgments are affirmed.